NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
Assistant United States Attorney
Public Corruption & Civil Rights Section
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Major Frauds Section
IAN V. YANNIELLO (Cal. Bar No. 265481)
General Crimes Section
    1500/1100/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0363/6527/3667
    Facsimile: (213) 894-6436/6269
    E-mail:    cassie.palmer@usdoj.gov
                scott.paetty@usdoj.gov
                ian.yanniello@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-183(A)-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT OF ALLEGED VICTIM NEGLIGENCE |
| v. | |
| TODD MICHAEL FICETO, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cassie D. Palmer, Scott Paetty, and Ian V. Yanniello hereby moves *in limine* for an order excluding evidence and argument concerning alleged victim negligence.

//

1    This motion is based upon the attached memorandum of points and

2  authorities, the files and records in this case, and such further

3  evidence and argument as the Court may permit.

4  Dated: May 21, 2019            Respectfully submitted,

5                                 NICOLA T. HANNA
                                  United States Attorney
6
                                  LAWRENCE S. MIDDLETON
7                                 Assistant United States Attorney
                                  Chief, Criminal Division
8

9                                 _____/s/_____
                                  CASSIE D. PALMER
10                                SCOTT PAETTY
                                  IAN V. YANNIELLO
11                                Assistant United States Attorneys

12                                Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

      A.    Relevant Procedural History............................2

      B.    The Charges Against Defendant Ficeto...................3

      C.    The Fraud Scheme.......................................3

            1.    Defendant Controlled Hunter World Markets and Co-
                  Conspirator Homm Managed and Controlled the
                  Absolute Funds...................................3

            2.    The Stock Manipulation Conspiracy................5

            3.    The Co-Conspirators Arranged for Small Private
                  Companies to Become Publicly Traded Penny Stocks.....6

            4.    The Manipulative Trading Activity................7

            5.    Defendant Instructed HWM's Trader to Conceal the
                  Existence of the Windows Instant Messaging ("IM")
                  System Used to Manipulate the Penny Stocks...........8

                  a.    Marking the Close..........................9

                  b.    Cancelled and Back-Dated Trades...............10

            6.    Self-Dealing Trades.............................11

            7.    The Fraud is Exposed in September 2007 When Co-
                  Defendant Homm Abruptly Resigned...................12

      D.    Defendant's Improper Victim Negligence Argument.........13

III.  ARGUMENT....................................................15

IV.   CONCLUSION..................................................19

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Federal Cases**

United States v. Allen,

  201 F.3d 163 (2d Cir. 2000) ......................................... 19

United States v. Biesiadecki,

  933 F.2d 539 (7th Cir. 1991) ....................................... 19

United States v. Ciccone,

  219 F.3d 1078 (9th Cir. 2000) ...................................... 17

United States v. Coffman,

  94 F.3d 330 (7th Cir. 1996) ........................................ 18

United States v. Colton,

  231 F.3d 890 (4th Cir. 2000) ....................................... 18

United States v. Coyle,

  63 F.3d 1239 (3d Cir. 1995) ........................................ 16

United States v. Ellison,

  704 F. App'x 616 (9th Cir. 2017) ................................... 15

United States v. Hanley,

  190 F.3d 1017 (9th Cir. 1999) ...................................... 17

United States v. Kreimer,

  609 F.2d 126 (5th Cir. 1980) ....................................... 17

United States v. Lindsey,

  850 F.3d 1009 (9th Cir. 2017) ............................. 15, 16, 18

United States v. Moore,

  923 F.2d 910 (1st Cir. 1991) ....................................... 16

United States v. Rennert,

  374 F.3d 206 (3d Cir. 2004) ................................... 15, 16

ii

United States v. Svete,

  556 F.3d 1157 (11th Cir. 2009) ................................ 17, 18

United States v. Thomas,

  377 F.3d 232 (2d Cir. 2004) ................................. 16, 17

United States v. Winkle,

  477 F.3d 407 (6th Cir. 2007) .................................. 16

**Federal Statutes**

15 U.S.C. §§ 80b-6, 80b-17, 2 ................................... 3

18 U.S.C. §§ 1001(a)(2), 2(b) .................................. 3

18 U.S.C. §§ 1348 .............................................. 3

18 U.S.C. § 1349 ............................................... 3

18 U.S.C. § 1505 ............................................... 3

18 U.S.C. §§ 1957, 2(b) ........................................ 3

18 U.S.C. § 1956(h) ............................................ 3

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant Todd Ficeto ("defendant" or "defendant Ficeto") together with co-defendants Florian Homm ("Homm"), Colin Heatherington ("Colin Heatherington"), and Craig Heatherington ("Craig Heatherington") engaged in a sophisticated, multi-national conspiracy to commit securities fraud and wire fraud, as well as other crimes, arising from financing deals and securities transactions involving a group of hedge funds headquartered in Mallorca, Spain, (the "Absolute Funds" or the "Funds"). The victims of the scheme were the Absolute Funds and the victim-investors in the Funds who suffered losses due to the co-conspirators' use of United States-based penny stocks to: (1) inflate the value of the Absolute Funds; (2) self-deal by trading penny stock shares to their own benefit and at the Funds' detriment; and (3) generate large fees and commissions through private placement investments and trading activity.

The government hereby moves to exclude evidence and arguments concerning any alleged victim negligence related to the scheme. Specifically, defendant should be precluded from questioning witnesses or arguing that victim-investors in the Absolute Funds or executives, managers, or auditors at the Funds knew or should have known that the co-conspirators were, among other things, acquiring shares in United States based penny stocks and manipulating those shares to inflate the net asset value of the Absolute Funds, to enrich themselves through self-dealing trades, or to generate significant commissions on trades conducted by Hunter World Markets,

1   the broker/dealer co-owned by defendant and Homm.  Such "blame the
2   victim" arguments are improper and should be excluded.

3   **II.  STATEMENT OF FACTS**

4       To assist the Court in addressing all the government's motions
5   in limine, the government provides the following relevant procedural
6   history and description of facts underlying the charges in this
7   case.[1]  The government will refer back to these facts, as needed, in
8   subsequent motions.

9       **A.  Relevant Procedural History**

10      The first superseding indictment ("FSI") charges defendant
11  Ficeto, Homm, Colin Heatherington, and Craig Heatherington with
12  crimes related to a stock market manipulation scheme, described in
13  more detail below.  Defendant Ficeto is the only defendant proceeding
14  to trial at this time.  Homm, a German national, is a fugitive from
15  justice currently believed to be residing in Germany, a country that
16  does not extradite its citizens to the United States.  Colin
17  Heatherington resides in Canada and is subject  to extradition
18  proceedings to bring him to the United States to face the charges in
19  this case.  Colin Heatherington's extradition hearing currently is
20  scheduled to begin on September 18, 2019.  Craig Heatherington,
21  Colin's brother, resides in Australia and has entered into a deferred
22  prosecution agreement with the government.  Craig Heatherington is
23  expected to testify at trial in this matter.

---

[1] This recitation of facts reflects the anticipated testimony
and related exhibits the government expects to elicit in its case-in-
chief as relevant to this Motion.

2

**B.    The Charges Against Defendant Ficeto**

The government is proceeding to trial against defendant Ficeto on the following charges:

Count One: Conspiracy to Commit Securities Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349; Counts Two through Nine: Securities Fraud, in violation of 18 U.S.C. §§ 1348, 2; Counts Twenty-Three through Twenty-Five: Investment Adviser Fraud, in violation of 15 U.S.C. §§ 80b-6, 80b-17, 2; Count Thirty: Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h); Counts Thirty-One through Thirty-Three: Unlawful Monetary Transactions, in violation of 18 U.S.C. §§ 1957, 2(b); Count Thirty-Four: Obstruction of Justice, in violation of 18 U.S.C. § 1505; Count Thirty-Five: False Statements, in violation of 18 U.S.C. §§ 1001(a)(2), 2(b); Counts Thirty-Six and Thirty-Seven: Unlawful Monetary Transactions, in violation of 18 U.S.C. §§ 1957, 2(b).

**C.    The Fraud Scheme**

1.    <u>Defendant Controlled Hunter World Markets and Co-Conspirator Homm Managed and Controlled the Absolute Funds</u>

Defendant Ficeto and Homm first met in the 1990s.  Defendant and Homm initially were partners in VMR Capital Markets ("VMR").  Homm left VMR in 2001 and rejoined the company when defendant rebranded it as Hunter World Markets ("Hunter World Markets" or "HWM"), in approximately 2004.  Defendant and Homm each owned 50% of HWM.  HWM was a broker/dealer,[2] was engaged in investment banking, and was registered with the United States Securities & Exchange Commission

---

[2] A broker/dealer is a brokerage that buys and sells securities on behalf of its clients (wherein it acts as a broker) or for its own account (wherein it acts as a dealer).

3

("SEC") and the United States Financial Industry Regulatory Authority ("FINRA").

Defendant was the President and Director of HWM and ran the company's day-to-day operations from its office in Beverly Hills, California. During the relevant time period, the only employees at HWM were defendant, defendant's assistant (Anita Razo), the head trader (Tony Ahn), and a part-time compliance officer (Elizabeth Pagliarini), the last of whom defendant hired because FINRA had placed him on heightened supervision as a result of prior regulatory sanctions.[3] The government anticipates testimony at trial will demonstrate that the compliance officer was in the office only once a week. Testimony from the other HWM employees will establish that defendant was immersed in every aspect of Hunter World Markets' business, including the trading activities and was aware of, and indeed, approved every trade that took place at Hunter World Markets.

From approximately 2004 through his abrupt resignation on September 18, 2007, Homm was the founder and Chief Investment Officer of Absolute Capital Management Holdings ("ACMH"), a hedge fund management company. Homm managed the Absolute Funds from Mallorca, Spain, through ACMH, which ultimately was registered on the Alternative Investment Market of the London Stock Exchange, and was an investment advisor registered with the SEC. The Absolute Funds

---

[3] In addition to managing Hunter World Markets' business, defendant was the principal for The Hunter Fund, a hedge fund established by defendant in the British Virgin Islands and managed through Hunter Advisors, an investment adviser that was registered with the SEC. The only investors in the Hunter Fund were three Absolute Funds, described below: the Absolute Return Europe Fund Limited ("Return Europe Fund"), the Absolute European Catalyst Fund Limited ("Catalyst Fund"), and the Absolute Octane Master Fund Limited ("Octane Fund").

4

were a collection of eight Cayman Islands-based hedge funds comprised of the following:  Absolute East West Fund Master Fund Limited ("East West Fund"), Absolute Activist Value Master Fund Limited ("Activist Value Fund"), Absolute Large Cap Master Fund Limited ("Large Cap Fund"), Absolute Germany Fund Limited ("Germany Fund"), Absolute India Fund Limited ("India Fund"), as well as the Return Europe Fund, the Catalyst Fund, and the Octane Fund.

ACMH charged each fund a monthly management and performance fee, based on the fund's net asset value ("NAV").[4]  The NAV was a critical indicator of the Funds' performance and profitability and dictated the management and performance fees that were due to Homm, as the Funds' manager.  As Chief Investment Officer of the Funds, Homm had primary control over all investment decisions and, with the assistance of defendant Ficeto and other co-conspirators, caused the Funds to purchase billions of shares in United States-based penny stocks.  The term "penny stock" refers to a small company's stock that is low-priced, typically trading below five dollars per share, and often below one dollar per share.  Penny stocks generally are thinly traded and relatively illiquid, meaning the shares are not easily convertible to cash.

2.   <u>The Stock Manipulation Conspiracy</u>

Defendant Ficeto and his co-conspirators used the Absolute Funds to acquire shares in the penny stock companies through investment and financial deals that defendant arranged, initiated, and executed. After acquiring the penny stock companies' shares, the co-

---

[4] A hedge fund's NAV is an important metric for evaluating the fund's performance and attracting future investment.  The NAV of a hedge fund is calculated by deducting the liabilities of the fund from the assets and dividing by the number of issued shares.

conspirators engaged in manipulative trading practices to inflate the value of those shares, which in turn artificially increased the NAVs of the Absolute Funds and the Hunter Fund, resulting in massive profits to co-conspirators at the ultimate expense of the Absolute Funds and the Funds' investors. When the scheme unraveled, the stock prices of the penny stock companies plunged.

3. The Co-Conspirators Arranged for Small Private Companies to Become Publicly Traded Penny Stocks

Defendant Ficeto, through the investment banking side of HWM, searched for penny stock companies that could become publicly traded in the United States. Once the penny stock companies became publicly traded, they were listed on the "pink sheets" or the "Over-the-Counter-Bulletin-Board", two U.S.-based over-the-counter listing services, which list stocks for small companies, unlike national exchanges like the New York Stock Exchange or NASDAQ. Specifically, defendant Ficeto would locate penny stock companies, and take these companies public through a process called a "reverse merger," whereby Ficeto would merge the privately-held company into an existing public "shell-company" that was owned by defendant Ficeto. After the reverse merger, defendant Ficeto arranged private placements, also known as "PIPE" (public investment in private equity) deals whereby the Absolute Funds would invest significant amounts of money, often millions or tens of millions of dollars, in the penny stock companies, in return for shares of stock at a deep discount, or warrants to purchase such shares in the future at a deep discount.

In addition to receiving substantial placement agent fees, defendant Ficeto caused millions of shares to be issued to himself, Hunter World Markets, Homm, and to CIC Global Capital Limited, a

company owned by co-conspirators Colin and Craig Heatherington. Through these transactions, defendant Ficeto also caused company insiders and pre-existing shareholders to enter into "lock-up agreements" that precluded them from trading their own shares.  Once the co-conspirators' shares became tradeable, Homm would instruct defendant to trade the penny stock shares through Hunter World Markets at prices that Homm and defendant Heatherington would dictate, in conjunction with defendant Ficeto, in markets that they controlled by virtue of their domination of the freely tradeable shares of the penny stocks.  During the relevant timeframe, defendant and his co-conspirators overwhelmingly controlled the trading activity in many of the penny stocks (for example, the co-conspirators accounted for over 90% of the trading in the penny stocks, ProElite and Berman Center).

### 4.   The Manipulative Trading Activity

Through Hunter World Markets, defendant Ficeto enabled virtually all of the penny stock trading for the Absolute Funds.  As co-owners of Hunter World Markets, defendant and Homm reaped commissions of up to five cents per share on the buy and the sell side of each trade that Hunter World Markets charged to the Funds.

The penny stock trades on behalf of the Absolute Funds often took the form of manipulative "cross trades" (the sale of stock from one Absolute Fund to another) and trading techniques such as "marking the close" (a prohibited practice that involves setting closing prices), backdated trades, and cancelled trades.  As noted above, defendant and his co-conspirators used these manipulative trades to fraudulently inflate the stock prices of the penny stock companies, which in turn artificially inflated the NAV of the Absolute Funds and

the Hunter Fund -- a prohibited practice known as "portfolio pumping."  The co-conspirators generally engaged in portfolio pumping at the end of the month, in order to increase the value of the penny stock companies and therefore increase the Absolute Funds' NAV, which enabled Homm to falsely advertise higher returns, reap higher fees, and attract -- and defraud -- new and unsuspecting victim-investors.

     5.   <u>Defendant Instructed HWM's Trader to Conceal the Existence of the Windows Instant Messaging ("IM") System Used to Manipulate the Penny Stocks</u>

Evidence at trial will establish that traders from the Absolute Funds, including co-defendant Colin Heatherington, transmitted to HWM the trade orders in the penny stocks by telephone, email, and also by instant message ("IM") system.  Under FINRA and SEC rules, all electronic communications related to trading activity had to be retained and archived by the broker-dealer to facilitate review and oversight.  However, Tony Ahn, the trader at Hunter World Markets, will describe a Microsoft Windows IM system (the "secret IM system") that he used at the direction of defendant Ficeto and Colin Heatherington to discuss trades in the penny stocks.  According to Ahn, defendant Ficeto instructed him to use the secret IM system because it was not automatically archived, in contrast to other IM systems like Bloomberg, which was automatically archived.  Use of the secret IM system enabled the co-conspirators to hide conversations about trades in the penny stocks from regulators and HWM's own compliance officer.  The government will introduce at trial a series of secret IMs that Ahn saved and emailed to himself, which illustrate the manipulative trading techniques described in the FSI.

a.   *Marking the Close*

"Marking the close" is a term used in the securities industry when traders execute trades to influence or control the closing price of a stock at or near the close of the market.  Such interference to set the closing price is deceptive and impermissible.

On May 31, 2007, the following discussion occurred on the secret IM system wherein Colin Heatherington relayed closing prices for penny stocks to Tony Ahn.[5]

```
Colin:     Hey Bro
Tony:      Yo C[olin]
Colin:     closing prices please
Colin:     BMRC 4.00
Colin:     MMCV 1.00
Colin:     PELE 14.00
Colin:     QSTG 1.25
Colin:     LCYC 2.00
```

Tony Ahn subsequently responded to Colin Heatherington that the "PELE cross is up at 14," signifying that Ahn had executed a cross-trade at the set closing price for penny stock, ProElite (ticker: PELE).  Notably, defendant Ficeto also used Ahn's secret IM system to communicate with co-conspirators.  For example, on May 31, 2007, defendant sent messages to Ahn using co-conspirator Colin Heatherington's secret IM account:

```
[Defendant]:   anything happening?  It's Todd.
Tony:          hey todd . . . getting ready for the close
[Defendant]:   everything good?
Tony:          office has not burned down yet
```

Another "marking the close example" took place on July 30, 2007, when Colin Heatherington sent closing prices to Tony Ahn.

```
Colin:    some closing prices for today
```

_____

[5] BMRC, MMCV, PELE, QSTG, and LCYC are ticker symbols for penny stock companies alleged in the FSI, specifically, Berman Center, MicroMed, ProElite, Quest, and InterMetro (under InterMetro's precursor ticker symbol), respectively.

9

```
            JVDT 3.00
            QSTG 1.25
            IMTO 2.00[6]
```

These are just a selected few examples of the co-conspirators'
use of secret IMs to set closing prices in the penny stocks.

*b.   Cancelled and Back-Dated Trades*

"Cancelled trades" referred to trades that were entered or
"printed" by Hunter World Markets on behalf of the Absolute Funds at
the end of the month and then cancelled later.   "Back dated" trades
were entered in one month and back-dated for the previous month.   The
co-conspirators used both techniques to artificially inflate the
Absolute Funds' NAVs.[7]

The secret IMs also reflect these fraudulent trading techniques.
For example, on November 29, 2006, Colin Heatherington and Ahn
engaged in the following exchange on the secret IM system:

```
Colin:  Can you please print PELE at 2.75
Colin:  ok to do it no
Colin:  now
Tony:   will print up the print now, and also fyi, on
        month end, I will always put the print up with 45
        minutes left, so that gives both of us a chance to
        see with the time delay as well
Colin:  ah, txs
Tony:   :)
Tony:   PELE print is up
Colin:  txs
Tony:   I think I will have to pass tickets to make it look
        legit, and then cancel the trades a few days later
```

---

[6] JVDT, QSTG, and ITMO are ticker symbols for penny stock
companies alleged in the FSI, specifically, Java Detour, Quest, and
Intermetro, respectively.

[7] The co-conspirators used cancelled trades to manipulate the
closing prices of penny stocks because, even though the trades were
later cancelled, the sales price was "printed," and thus was
reflected in the calculation of the Absolute Funds' NAV.   Similarly,
back-dated trades were used as a post-hoc method to manipulate the
NAV calculations from a prior month.

Earlier that day, Colin Heatherington sent a secret IM to Ahn saying, "Pls have Todd call when he arrives."  Ahn responded, "I will let him know."

Among other things, Ahn is expected to testify that defendant expressly told him not to tell the SEC, Hunter World Markets' compliance officer, or Hunter World Markets' attorney about the secret IM system.  In addition to facilitating and concealing the fraud scheme, defendant's directive to Ahn to conceal the secret IMs forms the basis of an obstruction of justice count against defendant (Count Thirty-Four).[8]

### 6.  Self-Dealing Trades

Defendant, Homm, and Colin Heatherington also made tens of millions of dollars through self-dealing trades by selling their own shares of the artificially inflated penny stocks to the Absolute Funds.  The co-conspirators held these shares in their names, the names of companies they controlled, or, in defendant Ficeto's case, even the names of his children.  Through the reverse mergers, PIPE transactions, and side-deals with the Absolute Funds, defendant, Homm, and Colin Heatherington would obtain shares in the penny stock companies, or warrants to purchase such stock, at a deep discount.  Through the manipulative trading activity outlined above, the co-conspirators would then move the price of the stock so they could trade their own shares at a profit.

---

[8] Similarly, Count Thirty-Five charges defendant with making a false statement in sworn testimony before a representative of the SEC on September 4, 2008, namely, that defendant answered "no" when asked whether he held any foreign accounts.  Among other things, the government will introduce evidence showing that just days before, on August 29, 2008, defendant transferred approximately $10 million from accounts he controlled at Wells Fargo Bank to a newly opened foreign account at a bank located in the Cook Islands.

One example of such self-dealing occurred over the span of four minutes near the end of the trading day on May 15, 2007, when Homm, Colin Heatherington, and defendant Ficeto, through trades conducted by Hunter World Markets after the close of the trading day, caused the price of one of the penny stocks, ProElite, to rise from $3.25 to $8 (where Colin Heatherington sold shares held by CIC and Hunter World Markets sold shares to the Return Europe Fund), then to $12 (where defendant Ficeto sold shares held in the names of his children to the Return Europe Fund).  Hunter World Markets accounted for 100% of the trading volume in ProElite for the day.

        7.   The Fraud is Exposed in September 2007 When Co-
             Defendant Homm Abruptly Resigned

On the eve of the fraud being discovered, Homm abruptly resigned from his position at the Absolute Funds and fled, leaving in his wake a sea of redemption requests by investors who discovered that significant portions of their investments had been placed into highly risky, speculative, and illiquid penny stocks.  The government will prove that defendant, Homm, and Heatherington victimized both the individual investors in the Absolute Funds, as well as the Funds themselves, to which Homm owed a fiduciary duty through his role as investment advisor of ACMH (which managed all eight Funds), and to which defendant Ficeto owed a fiduciary duty through his role as investment advisor of the Hunter Fund (whose sole investors were the Return Europe Fund, the Catalyst Fund, and the Octane Fund), by using Hunter World Markets as a vehicle to manipulate penny stocks, self-deal to their own benefit and to the detriment of the Funds they managed, and to generate fees and commissions through the private placement investments and the trading activity.

12

### D.   Defendant's Improper Victim Negligence Argument

The government expects evidence at trial to show that the Absolute Funds were created almost entirely as vehicles for investment in European markets.  Marketing materials show that ACMH marketed six of the eight Absolute Funds at issue in this case as focused on non-United States markets, including Europe and other emerging markets.[9]  These Funds' focus was evident in their names, e.g., the Germany Fund, the Return Europe Fund, and India Fund.  Only two Funds, the Octane Fund and the Catalyst Fund, offered investors vehicles for more aggressive investments that may extend to the United States, among other places.  And even then, marketing documents discussing the Funds' portfolios did not describe penny stocks as potential holdings.  Indeed, the name of the Large Cap Fund indicates that its focus would be investments in large, established companies,[10] not investments in penny stocks, which are inherently

---

[9] Specifically, in marketing materials, ACHM described the Funds as focusing on the following areas of investment: (1) the East West Fund was created "to benefit from a degree of harmonization and convergence between established and emerging Europe"; (2) the Activist Value Fund was focused on investing in "undervalued companies in Western European markets"; (3) the Large Cap Fund was focused on investing in "Large Caps in Western European and other developed markets based on bottom up research and controlled by a strict stop loss policy," meaning that certain criteria would trigger automatic sales of any investment incurring losses; (4) the European Catalyst Fund was focused on investing in "long and short European equities which are catalyst driven based on bottom up research and controlled by a strict stop loss policy"; (5) the Germany Fund was focused on investing in "German stocks long and short based on bottom up research and controlled by a strict stop loss policy"; (6) the India Fund was focused on investing in "long and short primarily in Indian companies"; (7) the Octane Fund was focused on "an absolute return for investors, with a high risk tolerance and a view to capital gain on an annual basis"; and (8) Return Europe Fund was focused on "European stocks long and short based on bottom up research and controlled by a strict stop loss policy."

[10] The government expects to elicit testimony at trial that "large cap" generally refers to refers to a company with a market capitalization value of more than $10 billion.

speculative, risky, and prone to manipulation.  At least one victim-
investor in the Absolute Funds is expected to testify at trial that,
based on his review of marketing materials and attendance at
corporate presentations with principals of the Absolute Funds,
including Homm, he was unaware that the Absolute Funds he invested in
would hold significant positions in penny stocks, and that he would
not have invested in the Funds had he known of such a practice.

Nevertheless, the government expects defendant to argue that the
Absolute Funds and their individual investors either knew or should
have known that the Funds held significant positions in the risky
penny stock investments.  Defendant thus may claim that (1) the
Absolute Funds are not victims because the penny stock investments
were disclosed to the Funds' executives, administrators, and auditors
via reports or other documents that were circulated within the Funds;
and (2) the Funds' individual investors are not victims because
investor-relations materials, including prospectuses and offering
memoranda, contained language granting Homm wide discretion to pursue
investments, arguably including investments in United States-based
penny stocks.  Defendant even may attempt further to allege that
certain executives at the Funds not only were aware of but also
actively encouraged Homm and defendant Ficeto's activities related to
penny stocks, either for their own enrichment or because they feared
confronting Homm about his investment choices.

Such arguments are improper and should not be allowed.  The
relevant inquiry here is whether defendant and his co-conspirators
engaged in a scheme to manipulate U.S.-based penny stocks to inflate
the Funds' NAV, while enriching themselves through fees, commissions,
and self-dealing trades; whether defendant Ficeto had the requisite

1   intent to defraud the Funds and their investors; and whether, for

2   certain counts, defendant Ficeto violated a fiduciary duty in so

3   doing.  Hindsight challenges to the vigilance or supervision of

4   executives, administrators, auditors or individual investors in the

5   Funds are irrelevant, a waste of time, and create the risk of jury

6   confusion.

7   **III. ARGUMENT**

8        Defendant and his co-conspirators engaged in a years-long stock

9   manipulation conspiracy that defrauded the Absolute Funds and the

10  investors in the Funds.  Both are victims.  These victims suffered

11  losses after the co-conspirators stopped manipulating penny stock

12  prices, following Homm's abrupt departure.  The Funds undertook an

13  investigation, which revealed the extent to which the Funds' held

14  penny stocks.

15       Criminal laws, particularly those dealing with fraud, are

16  designed to protect all victims, regardless of the care they have

17  exercised in their affairs.  As the Ninth Circuit has made clear, "a

18  victim's negligence is not a defense to . . . fraud." United States

19  v. Lindsey, 850 F.3d 1009, 1015 (9th Cir. 2017).  This reasoning

20  extends to securities fraud as well.  See United States v. Ellison,

21  704 F. App'x 616, 620 (9th Cir. 2017) ("a victim's negligence is not

22  a defense" to securities fraud); see also United States v. Rennert,

23  374 F.3d 206, 213 (3d Cir. 2004) (vacated in part on separate

24  grounds) (rejecting victim negligence defense in a securities fraud

25  case).

26       In Lindsey, the Ninth Circuit affirmed the principle (as

27  articulated by number of other circuits) that "a fraud victim's

28  negligence is not a defense to criminal charges under the federal

15

fraud statutes."  850 F.3d at 1014-15 (affirming the district court's decision to exclude evidence of victim negligence and citing cases from the Second, Third, Fourth, Fifth, and Eleventh Circuits).  In so holding, <u>Lindsey</u> rejected the idea that a lender's negligence, careless decision-making, or even reckless indifference could be a defense to a scheme to defraud, holding that a mortgage lender's negligence "does not mean lenders can be victimized by intentional fraudulent conduct with impunity merely because the lenders were negligent, or even because the lenders intentionally disregarded the information . . . Two wrongs do not make a right."  <u>Id.</u>  The court emphasized that a victim's "negligence, or even intentional disregard, cannot excuse another's criminal fraud."  <u>Id.</u>

Several other courts have reached similar conclusions regarding the inadmissibility of a victim negligence defense in fraud cases. <u>See</u> <u>United States v. Moore</u>, 923 F.2d 910, 917 (1st Cir. 1991) ("[I]t is not a defense that the bank might have prevented its losses had it better internal controls or procedures."); <u>United States v. Coyle</u>, 63 F.3d 1239, 1244 (3d Cir. 1995) ("[T]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); <u>United States v. Rennert</u>, 374 F.3d 206, 213 (3d Cir. 2004) (vacated in part on separate grounds) ("[A] fraud victim's negligence or lack of diligence in uncovering the [securities] fraud is not a defense."); <u>United States v. Thomas</u>, 377 F.3d 232, 243-44 (2d Cir. 2004) (collecting and endorsing cases rejecting argument that victim's failure to discover fraud "somehow vitiates [the defendant]'s fraudulent intent"); <u>United States v. Winkle</u>, 477 F.3d 407, 418 (6th Cir. 2007) (approving the exclusion of an FDIC report that criticized the bank fraud victim's failure to detect a fraud

16

scheme); <u>United States v. Svete</u>, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); <u>United States v. Kreimer</u>, 609 F.2d 126, 132 (5th Cir. 1980) (affirming victim negligence is no defense to fraud because "[t]he truth about virtually every scheme to defraud could be obtained if the gull were clever and diligent enough").

The fact that the Absolute Funds' executives, administrators, and auditors and the Funds' investors were on the whole savvy and sophisticated, and could have discovered the fraud is irrelevant. Put another way, it does not matter that the Funds or their victim-investors could have or should have known that the Funds were heavily invested in penny stocks.  The fraud laws, including wire and securities fraud, protect the naïve as well as the "worldly-wise," and it is immaterial whether, by poring through enough publicly available information, the victim-investors or the Funds could have outed the fraud and ended the deception.  <u>See</u> <u>United States v. Ciccone</u>, 219 F.3d 1078, 1083 (9th Cir. 2000) (holding that the government need not prove that a fraud scheme was "calculated to deceive persons of ordinary prudence and comprehension"); <u>Thomas</u>, 377 F.3d at 242 ("The role of the ordinary prudence and comprehension standard is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless.").  Indeed, the susceptibility of a victim to a scheme to defraud is totally irrelevant to a defendant's guilt or innocence. <u>United States v. Hanley</u>, 190 F.3d 1017, 1023 (9th Cir. 1999) ("It is immaterial whether only the most gullible would have been deceived by the defendants' scheme") (internal quotation marks omitted)

(superseded by statute on other grounds); see also United States v. Colton, 231 F.3d 890, 903 (4th Cir. 2000) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright.  These are criminal statutes, not tort concepts."); United States v. Coffman, 94 F.3d 330, 334 (7th Cir. 1996) ("The fact that a reasonable person would not have been deceived [by the fraud] would be no more relevant than the fact that a murder victim would have survived had he been wearing a bulletproof vest.").

Moreover, whether the Funds' executives, administrators, or auditors knew or should have known about the penny stock investments, saw the warning signs and disregarded them, or even actively encouraged the fraud for any reason (self-interest or otherwise) is similarly irrelevant.  The Lindsey court rejected this very argument as it relates to materiality.  Specifically, the victim's intentional disregard of a defendant's criminal conduct "cannot provide an effective defense based on alleged lack of materiality."  Lindsey, 850 F.3d at 1015.  That the victim-lenders in Lindsey "might have intentionally disregarded" the defendant's fraudulent conduct had little relevance to whether those actions were material.  Id. Similarly, here, the Absolute Funds "can[not] be victimized by intentional fraudulent conduct with impunity merely because [its executives, administrators, or auditors] were negligent, or even because the [those same individuals] intentionally disregarded" the information available to them.  850 F.3d at 1014; see also Svete, 556 F.3d at 1165 ("[T]he focus of [a] fraud statute, like any other criminal statute, is on the violator . . . and whatever role, if any,

18

a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute."); <u>United States v. Allen</u>, 201 F.3d 163, 167 (2d Cir. 2000) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability.").

This is especially true where, as here, the person at the helm of the Funds was a co-conspirator in the fraud.  It cannot be the case that because Homm approved manipulation of the penny stocks and self-dealing by the co-conspirators, the Funds are not victims. Homm's position of authority at the Funds was integral to the fraud scheme.  So too was defendant's role at the helm of Hunter World Markets.  Simply because Homm and defendant's criminal partnership may have been discoverable through a thorough evaluation of publicly available documents, does not insulate defendant from culpability.

Accordingly, the Court should prohibit defendant from introducing evidence or making arguments concerning any purported negligence or intentional disregard by the Absolute Funds or their investors related to their potential discovery of or response to the fraudulent conduct at issue in this case.  <u>See</u> <u>United States v. Biesiadecki</u>, 933 F.2d 539, 544 (7th Cir. 1991) (upholding exclusion of testimony that "would have improperly shifted the jury's attention away from the knowledge and intent of [defendant] and focused instead on the beliefs of the victim of the alleged scheme to defraud").

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court grant the government's motion to exclude evidence and argument on alleged victim negligence.