## DECLARATION OF CASSIE D. PALMER

I, Cassie D. Palmer, declare as follows:

1.    I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Central District of California.  Along with AUSAs Scott Paetty and Ian V. Yanniello, I represent the government in this case.  I make this declaration in support of the government's opposition to defendant Todd Ficeto's Motion *In Limine* to Exclude Testimony of Government Expert James Cangiano.

2.    Attached hereto as Exhibit 1 is a copy of the Mr. Cangiano's curriculum vitae, which the government produced to the defense on May 17, 2017.

3.    Attached hereto as Exhibit 2 is a copy of the Summary of Mr. Cangiano's Testimony, which the government produced to the defense on May 17, 2017.

4.    Attached hereto as Exhibit 3 is a copy of the Revised Summary of Mr. Cangiano's Testimony, which the government produced to the defense on May 28, 2019.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on May 28, 2019.

_____
CASSIE D. PALMER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 1

**JAMES M. CANGIANO**

20250 Golden Panther Drive, #2
Estero, Florida
Business: 239-405-1471
Home: 239-789-5100

**PROFILE**

James M. Cangiano brings more than 40 years of corporate leadership and regulatory experience to his work as a consultant and securities industry expert. Mr. Cangiano retired in February of 2004 as Senior Vice President of Regulation and Controls for the NASDAQ Stock Market. In that role Mr. Cangiano served as NASDAQ's chief regulatory officer and liaison with NASD, its former parent. Mr. Cangiano had joined the NASDAQ Stock Market in 2001.

Prior to that he was Senior Vice President of Market Regulation for NASD Inc. (the predecessor of FINRA) and was responsible for regulatory policy and real-time and historical surveillance of all matters pertaining to The NASDAQ Stock Market and the U.S. Over-the-Counter market.

Mr. Cangiano played a leading role in establishing regulatory policy for all trading practices in The NASDAQ Stock Market and the Over-the-Counter Bulletin Board (OTCBB). He also worked extensively with the Securities and Exchange Commission, the Securities Industry Association and the Securities Traders Association in developing and enhancing policies and practices relating to better and more efficient equity markets.

Mr. Cangiano is a recognized leader in the area of technology enablement. Under his direction, Market Regulation became known as a leader in real-time and historical surveillance technology.

 Mr. Cangiano has been featured in a number of magazine articles including Wall Street &Technology, the Wall Street Journal, and Institutional Investor, where he has been quoted as an authority on regulatory, surveillance and technology issues. He has also spoken publicly in conferences dealing with regulatory and technological matters.

Mr. Cangiano began his career with the NASD in 1972 as a District Examiner in New York, the NASD's largest district office. He quickly assumed various management positions within the district and was promoted to Assistant Director of the NASD's Washington, D.C. district office in 1975. He was named District Director of the NASD's Kansas City District in 1980. Prior to his assuming the responsibility for Market Surveillance in 1986, he held various managerial and executive positions including Corporate Secretary for the NASD.

Exhibit 1
Page 1 of 7

When he assumed the role of Director of Market Regulation, it was a relatively small department of approximately 38. He oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ market. Since that time the department has grown to its current level of over 200 individuals including significant legal and technology staff.

He had full responsibility for real time and historical surveillance of both The NASDAQ Stock Market and all other OTC markets. Given the fraudulent practices that were prevalent during his tenure, particularly in OTC market for penny stocks, he instituted a department within Market Regulation to deal exclusively with fraudulent trading practices in the OTC markets. The department was very successful in identifying and addressing major frauds within that marketplace. More recently, he has testified in numerous proceedings regarding fraudulent trading practices in the OTC market.

He has extensive public speaking experience including presentations before the Securities and Exchange Commission. He has spoken on numerous occasions to a wide range of industry groups.

Since his retirement in February of 2004, Mr. Cangiano has founded his own consulting company, Wildcat Consulting Inc., and specializes in providing expert services to law firms, broker/dealers, the Securities and Exchange Commission, and foreign governments.

In 2008, he was admitted to and testified as an expert in the U.S. District Court for Southern New Jersey, in *SEC v. Pasternak et.al.[1]*, regarding NASDAQ regulations and trading practices on behalf of the U.S. Securities and Exchange Commission. He also was admitted as an expert in the Eastern District of Pennsylvania, in the trial of *US.v. Margolies,[2]* where He testified in 2009 on behalf of the United States Attorney in the sentencing portion of the trial concerning estimated damages which could have accrued to the respondent based on his intention to manipulate an OTC security. He testified in March of 2011 as an expert on behalf of the SEC in a bench trial before the U.S. District Court for the Eastern District of New York in the trial of *SEC v. East Delta Resources Corp. et.al.[3]* There he testified concerning the use of wash and matched trades and other manipulative devices commonly used in market manipulations.

---

[1] In the United States District Court for the District of New Jersey, Civil Action No. 05-3905 (JAP).

[2] In the United States District Court for the Eastern District of Pennsylvania, Criminal No. 08-736.

[3] In the United States District Court for the Eastern District of New York, Case No. 8:08.CV- 10 - 0310

Exhibit 1
Page 2 of 7

Most recently he testified in May of 2012 in a jury trial in the U.S. Middle District of Florida, Tampa Division, in *US. v. Shoss*[4] et. al. Mr. Cangiano testified as an expert for the US government in the trading of securities and the use of reverse mergers as a method of going public.

He is a graduate of St. Francis College in Brooklyn, New York and also did extensive graduate studies at St. Johns University in Jamaica, New York.

Mr. Cangiano resides in Estero, Florida with his wife, Mariann. They have three grown children and two grandchildren.

**PROFESSIONAL EXPERIENCE AND SELECTED ACCOMPLISHMENTS**

**President, Wildcat Consultant Inc.**

May 2004-present

Consulted as an expert in a broad area of regulatory matters, surveillance and technology, and other securities related matters to regulators, government, broker/dealers and law firms.

---

[4] In the United States District Court for the Middle District of Florida, Tampa Division, No. 8:11 -cr- 366 T-30TBM.

Exhibit 1
Page 3 of 7

Areas of expertise include all market related issues particularly: market manipulation and fraud, underwriting and unregistered distributions, suitability, supervision and policies and procedures, all FINRA and NASDAQ rules and regulations, FINRA disciplinary actions and arbitrations.

**NASDAQ INC.**

Feb.2001- Feb. 2004

**Senior Vice President, Regulation and Controls, NASD Liaison**

Was responsible for NASDAQ's relationship with NASD. Oversaw the multi- million dollar contract with NASD and was responsible for managing NASDAQ's relationship with NASD, including the provision of market regulation services. Responsible for developing and recommending policies related to the regulation of NASDAQ, negotiating NASDAQ's regulatory budget and monitoring the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD.

**NASD Inc.**

Jan.1999-Feb.2001

**Senior Vice President, Regulatory Technology, NASD Inc.**

Was responsible for all line of business support and development of NASD regulatory technology. Responsible for the "business" oversight of the multi million dollar outsourcing contract with EDS and strategic business, regulatory and technological direction.

**NASD Regulation, Inc.**

May 1986- Dec. 1998

**Senior Vice President, Market Regulation**

Achieved progressively higher positions in Market Regulation starting as Director in 1986, Vice President in 1989 and Senior Vice President in 1993. Had total responsibility for the department, overseeing regulatory policy and enforcement efforts in The NASDAQ Stock Market and other markets operated by the NASD.

- As NASD Regulation's senior market executive, was responsible for overseeing all regulatory policy issues with respect to trading practices in The NASDAQ Stock Market.

Exhibit 1
Page 4 of 7

- Responsible for all real-time and historical surveillance of the NASDAQ Stock Market and all OTC markets including the investigation and adjudication of many of the NASD's most significant disciplinary actions. These included cases included many significant fraud cases that resulted in the largest collected fines and the highest amount of customer restitution ever imposed by the NASD.

- Successfully achieved all departmental goals relating to financial performance and quality of regulatory programs.

- Served as a member of NASD Regulation's senior management team, which set direction and policy for NASD Regulation, overall, as an organization.

- Headed up the NASD's regulation strategic planning efforts in 1992 and 1993.

- Served on a number of NASD Regulation and NASDAQ policy committees for strategic planning, employee satisfaction, and NASD corporate technology initiatives.

- Served as a member of the Intermarket Surveillance Group consisting of the market surveillance heads of the six primary markets in the United States and the heads of surveillance for numerous foreign exchanges throughout the world. Served as president of the Intermarket Surveillance Group in 1991 and, again, in 1996.

- Managed the development and implementation of several award wining systems including "RADAR" and the Advanced Detection System, "ADS", representing the latest in client server technology. Their implementation resulted in dramatic increases in efficiencies within the Market Regulation Department with gains of well over 50% in productivity and recognition by leading publications such as Wall Street & Technology and ComputerWorld.

- Senior executive in charge of the Order Audit Trail ("OATS") project, a $22 million dollar project that significantly enhanced regulatory reporting for US capital markets. Met SEC imposed deadlines while remaining within budget.

- Assumed responsibility for the leadership of the NASD's strategic reengineering of its regulatory functions through a ground-up analysis of people, process and technology including the development of a future vision for NASD Regulation.

Exhibit 1
Page 5 of 7

**Corporate Secretary**

1984-1986

NASD, Washington, D.C.

- Executive responsibility for administration of the NASD's Strategic Plan.

- Extensive meeting planning experience in carrying out the responsibility for all NASD Board of Governor meetings.

- Created extensive programs and gave presentations to all visitors to the Association representing foreign and domestic markets and foreign/domestic government officials.

- Provided executive assistance to NASD's president, Gordon S. Macklin, including extensive correspondence, planning and participation in high-level meetings including all meetings of the NASD's Senior Management Group.

**Associate Director 1981-1984**

NASD Regulatory Policies/Procedures, Washington, D.C.

Worked extensively in the areas of NASD regulatory policy including all NASD and SEC rule proposals. Also developed extensive examination programs and policies for NASD field examiners.

- Worked extensively on all NASD and SEC rule proposals including drafting of NASD comment letters.

- Acted as liaison to the NASD's Municipal Securities Committee, the Capital and Margin Committee and the NASD Operations Committee.

- Performed extensive industry liaison work with the SEC, Municipal Securities Rule-Making Board (MSRB), and the Options Self-Regulatory Council concerning the adoption of industry rules and proposals.

**1975-1981**

Held various managerial positions in the NASD's filed examination offices including District Director in Kansas City. NASD District Offices are responsible for implementing all examinations and enforcement efforts with respect to all NASD member firms and registered individuals within the district's jurisdiction.

Exhibit 1
Page 6 of 7

**EDUCATION**

***St. Francis College, Brooklyn, New York***

Bachelor of Arts, English 1968

***St. Johns University, Jamaica, New York***
30 Graduate Credits in English 1968-1970

Exhibit 1
Page 7 of 7

Exhibit 2

## CANGIANO TESTIMONY SUMMARY

James M. Cangiano is an expert in the United States and global securities industry and the laws and regulations governing securities transactions in the United States.  Cangiano has 41 years' experience in the securities industry, including employment from in or about 1975 through 2004 at the National Association of Securities Dealers ("NASD"), the predecessor entity to the Financial Industry Regulatory Authority ("FINRA").  Among other things, from 1986 through 1999, Cangiano was Senior Vice President of Market Regulation for the NASD.  In that role, Cangiano was the senior executive in charge of policing the "Over the Counter Bulletin Board" (or "OTCBB") and the Nasdaq Stock Market, which required him to establish surveillance and examination policies and procedures for the NASD in the area of small cap and micro-cap fraud. Cangiano was also responsible for working to establish regulatory policy for trading practices involving the OTC market.  Mr. Cangiano is an expert in the rules and regulations that govern trading on the domestic national exchanges, such as the New York Stock Exchange and Nasdaq Stock Market, as well as the domestic OTC markets.  Given his extensive regulatory background, he is qualified to analyze trading data and to give an expert opinion to identify market manipulation.  Cangiano is expected to provide an overview of the securities markets and to identify the hallmarks of market manipulation schemes reflected in the facts of this case, in sum and substance, as follows:

1.      In a free and open market, prices for securities are set by the forces of supply and demand.  A free market is generally characterized as one "where prices may be established by the free and honest balancing of investment demand with investment supply."  In most instances, securities are widely traded by numerous independent buyers and sellers who bring their collective judgments to bear regarding the perceived value of a security.  These buyers and

Exhibit 2
Page 1 of 17

sellers appear to and generally do possess legitimate economic motives for entering into a transaction.

2.     Under the securities laws, investors have the right to expect that the market in which they are buying or selling securities is free of artificial interference and is based on a combination of the present and future successes of the issuer and other informed investors coming together to buy or sell based on an accurate mix of issuer and market information then currently available.  The rules of the Securities and Exchange Commission, FINRA, and the national securities exchanges and associations require that significant disclosures be made regarding the nature of an issuer of securities, its business, and its finances.  The exchanges require listed companies to file periodic reports and to announce publicly the existence of material news that might affect the underlying value of the security.  In a free market, buyers and sellers make investment decisions based on a company's disclosures and their perception of the company's prospects for the future.  Market manipulation (causing share prices to increase or decrease for reasons NOT caused by free market forces) is an act of deceit and fraud because it causes stock prices to be falsely reported in that they purport to, but do not, accurately reflect the market value of the security.  Based on this deceit or falsehood, buyers and sellers may enter into transactions which they would not have entered into (absent the false information) and which may result in pecuniary loss.

3.     The closing price of a security, based on the last sale of the day, is of particular interest to investors as it represents the last reported transaction of the day. Among other things, the last sale of the day or month is widely disseminated to the investing public, both electronically and in print, to allow current and prospective investors to readily ascertain the underlying economic value of the security in question.  The last sale of the day is used in assessing trends in the market performance of the security.  In the context of a hedge fund, the last sale of the last day of the month is extremely important in determining a fund's performance measured by both the fund's Net Asset Value ("NAV") and the unrealized gains on the assets held within a fund's portfolio.  The monthly, quarterly, and year-end NAV for a fund is then

Exhibit 2
Page 2 of 17

used to calculate the fund's share price when new investors want to buy-in or when existing shareholders seek to redeem shares of the fund. Fund prospectuses, proxy soliciting materials, periodic reports and newsletters typically reflect those prices to current and prospective shareholders. Thus, when the stock prices used to calculate a fund's NAV have been manipulated, investors are deceived as to the value of the fund.

4.     There is no exhaustive list of market manipulation schemes because, as U.S. courts have recognized, the antifraud laws are designed to "encompass the infinite variety of devices that are alien to the climate of fair dealing." Herpich v. Wallace, 430 F.2d 792, 802 (5th Cir. 1970). Essentially, market manipulation is a willful attempt by the participants to interfere with the free market forces of supply and demand, and may involve a variety of techniques. Some common elements of a market manipulation scheme, however, include the following:

a.     "Wash sales" are "sales of securities made at about the same time as a purchase of the same . . . resulting in no change of beneficial ownership." A "matched order" is an "order to buy and sell the same security, at about the same time, in about the same quantity, and at the same price." Wash sales and matched orders are offsetting buy and sell orders that are used to create the impression of apparent activity – of market demand for a security and can be used for price manipulation. Wash sales and matched orders are explicitly defined as manipulative in Section 9 of the Securities Exchange Act of 1934, 15 U.S.C. § 78i.

b.     "Marking the close," a practice known in the securities industry as attempting to influence or control the closing price of a stock by executing purchase or sale orders at or near the close of the market. Interference in the market to establish a particular last sale of the day price where done, for example, in an effort to increase the price or demand for a stock, is deceptive and therefore detrimental to investors and the market in general, especially in a security for which there is not a significant or large group of potential purchases. In contrast, in a more heavily traded security, there are more trades that evidence the true price that legitimate buyers and sellers are prepared to pay for the security. Marking the close transactions usually involve actual trades but may also involve wash sales or matched orders.

Exhibit 2
Page 3 of 17

c.      A key indicator of marking the close is a pattern of trades occurring in the market at the end of the day which have the effect of influencing or establishing the closing price at the end of that day.  A pattern of up ticks or down ticks at the close of the market that occur over a period of time is indicative of an effort to mark the close.  A distinct pattern of activity by the same parties generally indicates that they are attempting to affect the price at which the stock will close.

d.      Where a market participant consistently overreaches the market price is another key indicator of a deceptive "marking the close" scheme.  It generally does not make economic sense for a participant to place orders for a security at a price higher than would be available in the market, because it requires the participant to pay more than needed for the security.  Accordingly, the hallmarks of a "marking the close" scheme include a pattern of trading above the market, combined with regular trades at the close of the day or month, and significant motivation or pecuniary interests to mark the close.

5.      Market manipulation schemes often involve the securities of issuer companies that are small and thinly capitalized with few assets, little or no operating history, inexperienced management and no real business plan, or may involve an ongoing business concern in need of capital, restructuring, or a new business plan.  These companies are selected because they not generally known to the investing public.  Because of the lack of genuine investor interest, it is easier for the scheme participants to control the trading of their securities.

6.      To conduct a market manipulation scheme, the scheme participants need to have a publicly traded entity in order to quickly access public markets to permit them to sell their stock. For these reasons, another common practice of scheme participants is to acquire a public "shell company" which generally is a defunct company with little or no assets, little or no operations, but that has value because it has a trading symbol and immediate access to public markets.

7.      Scheme participants in a market manipulation scheme often will identify a small company ("target company"), and merge it with the defunct shell company that is already publicly traded.  One indicia of such a scheme is when the target company has little or no

Exhibit 2
Page 4 of 17

operating history, inexperienced management, a limited business plan, and no public following,
so there is no obvious reason why the company would benefit from access to public capital, yet
such company acquires a shell public company in order to effect what is called a "reverse
merger."  Depending on the structure of the deal, the target company or the shell itself may
become the surviving entity.  In either case, the net result is the same: the scheme participants
end up with a publicly traded entity, the shares of which can now be sold into the marketplace.

8.      PIPE ("Private Investment In Public Equity") transactions may be indicative of a
market manipulation scheme.  PIPE transactions, in which a private investor buys a publicly
traded stock in a private transaction, are a lawful method of financing, but the SEC has initiated a
number of proceedings into abuses in the PIPE area.  As an SEC Administrative Law Judge has
stated: "PIPE transactions involve unregistered securities usually in the form of common,
preferred, or convertible shares.  The possibilities of manipulation are heightened because the
securities are low priced and the securities are not publicly known.  Indeed, the SEC has been
concerned that "promoters . . . paid in shares would pump up the price of the securities and then
sell restricted shares of the securities into the public market at inflated prices."

9.      Securities regulators and courts have laid out some general criteria to establish
whether a market is dominated and controlled by a particular broker-dealer.  Relevant to the
determination of whether a firm dominates and controls a market for a security is whether a
particular broker/market maker underwrote the security and sold a substantial percentage of the
offering to its own customers, whether the firm was responsible for significant trading in the
aftermarket, and whether the remaining amount of aftermarket trading was fragmented among
other dealers.  If a market maker has the ability to control prices, it can artificially set them
through price leadership.  Paying increasingly higher prices for a security, and bidding up a stock
or causing it be bid up, are well-established techniques used by participants in a market
manipulation scheme.  In a market where the floating supply is small, purchases of securities at
increasing prices have an especially significant impact on price.  Price rigging may be
accomplished by a manipulative participant with the assistance of a collaborating market maker

Exhibit 2
Page 5 of 17

who places successively higher bids for the stock as part of an orchestrated plan to push the stock price higher.  The activity lacks economic sense because of the participant's dominant position in the stock.

10.     Cangiano is expected to testify that a broker (such as ACMH's prime brokers) may extend credit to their investors by way of a margin account.  Securities in a margin account are purchased with cash loaned to the investor where the securities themselves are used as collateral.  Margin is the amount of "down payment" that an investor must make in a margin purchase and is usually expressed as a percentage.  For example, if a security were priced at $20 per share, a margin investor purchasing 100 shares would only have to deposit $10,000.  The remaining $10,000 would be lent to the investor by his broker.  The securities holdings in a "margin" account are valued ("marked to market") daily to insure that the account has sufficient equity ("maintenance margin") (the total value of the securities in the margin account minus what has been borrowed from the broker) to remain above the minimum level required by industry regulators (25%) or higher levels required by individual brokerage firms.

11.     Cangiano is further expected to testify that a "margin call" would occur if the equity fell below the appropriate maintenance level.  Failure to maintain the required maintenance margin would result in mandating that the investor deposit additional cash or securities into the account when the value of the underlying securities is not sufficient to adequately maintain the required margin maintenance amount. For example, if the position referenced above was marked to market at $10,000, this would result in zero equity in the account ($10,000 minus $10,000) and the account would be under margined.  If additional assets are not deposited to bring the account to the required maintenance, the broker has the right to begin liquidating securities in the account until it meets the appropriate levels. This may be done at the broker's discretion without the consent of the customer as regards the timing of the trades or the securities liquidated.

12.     Cangiano has reviewed, among other things, the following: Hunter World trading blotter; trading records maintained by the Absolute Funds; trading records maintained by

Exhibit 2
Page 6 of 17

FINRA; Bloomberg instant messages ("IMs") and emails maintained by Hunter World; Tony

Ahn's Windows IMs; various SEC filings by the Penny Stock Companies; and email

communications maintained by Hunter World and ACMH, all of which are expected to be

introduced into evidence at trial.  Cangiano has reached certain opinions regarding the trading

that took place at Hunter World at issue in this case.  Based on his review and analysis, as well as

his background and expertise, Cangiano is expected to testify to the principal opinions and

conclusions set forth below.

        a.     That by exercising control over the accounts of the Absolute Funds,

Ficeto, Colin Heatherington ("Heatherington"), and Homm possessed an ability to influence the

market prices of the securities of the Penny Stock Companies during the period in question,

through their domination and control of the market for those securities.  For example, to ensure

their ability to control the market for the Penny Stocks, Ficeto identified companies with no real

ability to attract public investors, typically caused them to be reverse merged with publicly

traded shell companies and, with Homm and Heatherington, caused the Absolute Funds to buy

massive quantities of their shares in PIPE transactions, which shares later were registered for

public trading.  As part of these deals, Ficeto also generally negotiated lock-up agreements with

the Penny Stock Companies' directors, executive officers and/or then-existing shareholders to

withhold their shares from trading in the market for a period of time.  These lock up agreements

had the effect of giving the Funds control of all or nearly all of the tradeable shares.  Typically,

when the lock up agreements expired and the insiders attempted to sell their shares, the effect

would be that the price of the shares would fall substantially.  For example, through matched

trades, the co-conspirators kept the closing price of Micromed at or nearly $4.00 per share until

March 30, 2007 but after the lock out agreements expired on or about April 1, 2007, the stock

began an inexorable slide and by April 23, 2007, the share price had dropped as low as $0.32 per

share.

        b.     The co-conspirators used techniques that have been recognized by the

SEC, FINRA and U.S. courts as "manipulative devices," including wash sales and matched

Exhibit 2
Page 7 of 17

orders, and thereby caused the reported prices and trading volumes of the Penny Stocks to be artificially set rather than be established through the free forces of supply and demand. Their effect on the market for the securities of the Penny Stock Companies was substantial in that it gave the appearance of an active market for the securities in question when, in fact, the defendants dominated the trading volume in those securities and inflated the reported trading volume and price of the securities through the use of artificial means.

       c.     Transactions executed near the end of the trading day made through Hunter World had the effect of artificially setting the closing prices of the securities of the Penny Stock Companies on those dates, employing a practice known by industry professionals and securities regulators as "marking the close."

       d.     In most market manipulation schemes, members of the public are the victims of the inflated prices, because they are generally induced to buy shares at above-market prices.  For example, in what is colloquially referred to as a "pump and dump" scheme, conspirators often cause false and misleading press releases to be issued, which purport that the issuers have made an "important" breakthrough or discovery.  Such public disclosures are intended to "pump" up the stock and bring investors into the market to act as contra parties to sales being made by the participants from their positions (when conspirators then "dump" their shares).  This "contra party" (or third-party) liquidity, provided by innocent investors, is generally what enables participants in the scheme to profit from selling their cheap stock.  In this case, however, the (contra party) liquidity for the co-conspirators' sales was provided by the Absolute Funds, which the co-conspirators could and did control to purchase shares of the stock at any prices they prescribed.  The effect was to artificially raise the price of the securities in question resulting in the funds purchasing stock at prices which did not reflect the free forces of supply.  The ultimate victims therefore were the Absolute funds and, as a result, the investors in the funds.

       e.     The trades that Heatherington caused to be placed in the Penny Stocks show that the co-conspirators were not motivated by a rational and legitimate economic purpose,

Exhibit 2
Page 8 of 17

in that they repeatedly caused the Absolute Funds to purchase the Penny Stocks at artificially inflated prices; that is, the Absolute Funds repeatedly paid more than they needed to for the Penny Stocks (assuming they had any legitimate purpose for buying the Penny Stocks in the first place).

f.     The inflated share prices of the Penny Stocks were not justified by the underlying economic activity of the Penny Stock Companies, all of whom repeatedly posted substantial losses during the period in question.   None of the Penny Stock Companies was profitable but nonetheless they managed to achieve significant market valuations based on cross trading between and among the Absolute Funds.  Notwithstanding their poor business prospects, the defendants caused the Absolute Funds to purchase additional shares of the Penny Stock Companies, even when the Absolute Funds already held substantial positions in those securities.

g.     Heatherington and Ahn's instant messages (IMs) demonstrate that the trading of these same Penny Stocks among the Funds was not motivated by a legitimate economic purpose, such as an analysis that the issuers were companies worthy of investment, and that the securities were worth at least their purchase prices.  Rather, the messages make clear that the purpose of the trades was to set or maintain certain inflated stock prices, and to affect the publicized Funds' financial results.

h.     For example, in addition to the above-described IMs in which Heatherington expressly requested that Ahn trade as necessary to achieve certain prescribed prices, at times Heatherington mentioned that this motivation was to affect the Funds' published financial results:

(1)     On October 11, 2006, Ahn, using the Windows IM system, sent a message to Heatherington confirming that "the print [meaning the stock price as reflected on the public listing systems] in [ProElite would] change in the next couple of days.   Heatherington replied, "ok, the sooner the better, we need it to release the NAVs."

(2)     On September 20, 2006, using the Windows IM system, Heatherington instructed Ahn to have "AIF" [Absolute India Fund] buy 800,000 shares of

Exhibit 2
Page 9 of 17

Logistical Support at $0.17, stating: "AIF needs a bit of performance." Ahn confirmed that he would "put it after 30 minutes after the close to make it less conspicuous."

      (3)      Heatherington and the co-conspirators' sales to, and trading among, the Absolute Funds permitted them to sell their individually-controlled shares of the Penny Stocks to the Absolute Funds at substantial profits and provided significant economic motivation to undertake many of the cross-trades between the Absolute Funds.

      i.      The actions of the co-conspirators caused substantial economic harm to the Absolute Funds, and investors in the Absolute Funds, in the following ways:

      (1)      Trading in the Penny Stocks was dominated and controlled by Homm, Heatherington, and Ficeto, who caused the Absolute Funds to buy and sell shares repeatedly through pre-arranged cross-trades. Many of these trades were also consistently used to mark the close of the market for those securities, invariably at month end. This timing was significant because the calculation of the Absolute Funds NAVs was performed by each fund's administrator on "Valuation Day," which was defined in the Absolute Funds' offering memoranda as being "the last calendar day of each month and/or such other days as the Directors in their absolute discretion may determine. Indeed, the IMs and trading records show that Heatherington repeatedly directed Ahn to make trades in order to set certain month and quarter ending closing prices.

      (2)      The effect of the month-end trades was almost always to increase or sustain prices of the Penny Stocks. The Absolute Funds' prospectuses, periodic reports and marketing material all reflected these prices and caused the NAVs of many of Funds to increase as a result. Even by trading a very small quantity of one of the Penny Stocks at the end of the month, when multiplying these artificial prices by the large number of shares that the Absolute Funds held in the Penny Stocks, the Funds claimed large unrealized gains in the book values of the Penny Stock holdings, which had material effects on the Funds' NAVs.

      (3)      The Absolute Funds investors therefore were deceived by the Absolute Funds' published financial reports. Because the Funds' published NAVs were

Exhibit 2
Page 10 of 17

calculated using then-current market prices for the Penny Stocks, and because those published prices had been manipulated by the co-conspirators, the Funds financial reports were exaggerated and investors were deceived.  But for the false financial reports, investors might not have purchased shares in the Funds.

(4)      The Absolute Funds investors were also deceived by the prospectuses of the Absolute Funds, which represented that the Funds were being professionally managed and invested in certain classes of assets, with appropriate oversight as to stock selection and risk management.  In fact, Homm, Heatherington and Ficeto, acting with and through Ahn, committed millions of dollars of the Absolute Funds' assets to OTC securities that were speculative, unseasoned, inappropriate for the Funds' stated mandates, and, because of the co-conspirators' own actions, in limited supply.

(5)      Through the repeated trading of the securities of the Penny Stock Companies between the Absolute Funds, the co-conspirators caused the Absolute Funds to incur unnecessary and excessive expenses, including brokerage commissions and other fees.  This resulted in a direct deprivation to the Absolute Funds, and some of these commissions went directly to enrich Homm and Ficeto, as co-owners of the broker-dealer Hunter World.

(6)      By causing the Absolute Funds to purchase stock from the co-conspirators at the false prices that had been elevated through matched trading and marking the close, Heatherington and the co-conspirators took money directly from the Absolute Funds. Because there was generally no market for these securities other than the Funds, the Funds were stuck with these virtually worthless securities after the scheme collapsed.

(7)      The overstatements of the NAVs of the Absolute Funds, by virtue of the actions of the co-conspirators, distorted both the purchasing and redemption value of the Absolute Funds.  Because the NAVs were used to value the price of purchasing or redeeming shares of a Fund, the inflated financial reports distorted both the purchasing and redemption value of the Funds.  Accordingly, incoming shareholders paid too much and redemptions had hidden premiums based on the inflated figures at which the Absolute Funds valued their

Exhibit 2
Page 11 of 17

positions in the Issuers.  The remaining shareholders in the Absolute Funds, in effect, underwrote those redemptions.  The actual effects of the co-conspirators' actions left the Absolute Funds holding between $440 and $530 million in illiquid securities, securities they could not sell due to the fact that the artificial market had collapsed, mostly made up of the U.S. microcap stocks purchased and traded by the Absolute Funds through Hunter World.  Outside of the funds' trading, those securities proved to be practically worthless.

(8)      The false financial reports also caused excessive management and performance fees to be paid to ACMH (and derivatively, to the ACMH executives and employees).  The performance and management fees were paid as a percentage of the values of the Funds; because the Funds were overvalued, ACMH was overpaid, at the expense of their clients, the Absolute Funds.

(9)      Investors in the publicly-traded firm ACMH were also deceived by the exaggerated published financial reports of the Absolute Funds.  Reports prepared by stock analysts who followed the ACMH stock looked to the performance of the various Absolute Funds to value ACMH.  Accordingly, investors who purchased ACMH shares in the public markets were also deceived.  When the true state of the Funds' financials was uncovered in September 2007, ACMH's share price dropped precipitously and the ACMH investors lost money.

(j)      The numerous Windows IMs between Heatherington and Ahn were primarily used by them to set artificial prices for the Penny Stocks in the marketplace. Heatherington would direct Ahn as to what trades to execute and what prices to establish.  There are many instances of directives given by Heatherington, through Ahn, and approved by Ficeto, that illustrate the co-conspirators' use of wash trades, matched orders, and orders marking the close of the market.

(k)      Cangiano is expected to point to examples within the trading records and IMs to support his testimony. For example:

Exhibit 2
Page 12 of 17

(1)     As confirmed by SEC records, in September 2006, Homm caused five Absolute Funds to spend approximately $10 million to purchase more than 4 billion shares of ProElite and more than 3 million warrants to purchase ProElite shares exercisable at $0.004 per share.  ProElite also issued shares to Hunter World and to Ficeto's minor children, and to CIC Global.  In January 2007, ProElite filed a registration statement to register these shares with the SEC; the registration statement became effective, meaning the shares were registered to trade, on May 14, 2007.

(2)     As reflected in the IM records, on May 15, 2007, Heatherington directed that all written confirmations of the May 15, 2007 transactions in ProElite (whose ticker symbol was PELE) be sent only to him, as follows:

**Heatherington**:  PELE confirms to me only today pls [please].

**Ahn:**  got it, I will make sure it goes only to your Hotmail.

(3)     Cangiano is expected to testify that this IM exchange, which was to ensure that the trade confirmations would not been sent to ACMH through the normal channels but be sent to Heatherington's private e-mail, is consistent with the conclusion that there was no legitimate business purpose for the trades, and that the trades reflect self-dealing on Heatherington's part.

(4)     After the May 15, 2007 email, Hunter World executed the following trades, all of which occurred after the close of the market on that same day and within a span of minutes:

| Account Name | Buy or Sell | Execution Time | Volume | Price | Total Proceeds |
|---|---|---|---|---|---|
| Activist Value Fund | S | 16:36 | 500,000 | $3.20 | $1,600,000 |
| Octane Fund | B | 16:36 | 500,000 | $3.30 | $1,650,000 |
| Large Cap Fund | S | 16:36 | 600,000 | $3.20 | $1,920,000 |
| East West Fund | B | 16:36 | 600,000 | $3.30 | $1,980,000 |
| European Catalyst Fund | S | 16:36 | 3,000,000 | $3.20 | $9,600,000 |
| Return Europe Fund | B | 16:36 | 3,000,000 | $3.30 | $9,900,000 |

Exhibit 2
Page 13 of 17

| Account Name | Buy or Sell | Execution Time | Volume | Price | Total Proceeds |
|---|---|---|---|---|---|
| CIC Global (HEATHERINGTON) | S | 16:38 | 140,000 | $7.99 | $1,118,600 |
| Hunter World | S | 16:38 | 800,000 | $7.99 | $6,392,000 |
| Return Europe Fund | B | 16:38 | 940,000 | $8.05 | $7,567,000 |
| T.F. as custodian for his minor daughter | S | 16:40 | 5,000 | $11.99 | $59,950 |
| T.F. as custodian for his minor daughter | S | 16:40 | 5,000 | $11.99 | $59,950 |
| Return Europe Fund | B | 16:40 | 10,000 | $12.05 | $120,500 |

(5)     In summary, in a span of minutes, Heatherington and the co-conspirators, who were the only parties to hold tradeable shares of ProElite, drove the price of ProElite stock from $3.20 to $12.00, and then sold portions of their personal ProElite stock holdings to the Return Europe Fund at elevated prices.  By using his position as a trader at ACMH to cause Return Europe Fund to purchase 140,000 shares from CIC Global, the company that he owned with his brother, at the wholly invented stock price of $7.99, Heatherington effectively embezzled $1 million from the Return Europe Fund, the client fund of Heatherington's employer, ACMH, through a single trade.

(6)     On May 16, 2007, using the Windows IM system, Ahn noted that Bloomberg was publicly reflecting the volume from the previous day's cross-trades.  He told Heatherington:

**Ahn:**     " just fyi, looks like certain pages of Bloomberg are showing stuff from PELE."

**Heatherington**: "perfect, hope it stays that way"

(l)     These messages indicate that another outcome of placing these cross-trades was to publicly disseminate highly deceptive information to the market – that is, what appeared to be substantial trading volume in ProElite, was, in fact, artificially created by the co-conspirators, in a security where they accounted for almost 100% of the trading volume. Because

Exhibit 2
Page 14 of 17

there was no public demand for the stock, any apparent increase in market price was a direct result of these pre-arranged cross-trades, thus perpetrating a fraud on the market.

(m)     Trading records also show that Heatherington and Ficeto employed matched orders to liquidate their personal holdings and sell them to the Absolute Funds at the inflated prices. Between May 15, 2007, when the Absolute Funds' and the co-conspirator's shares became registered to trade, and September 19, 2007, when Homm resigned, approximately 1.2 million shares of ProElite were sold by accounts controlled by Heatherington and Ficeto at around $15 per share for total proceeds of around $18 million. This does not include the sales commissions and credits which accrued to Hunter World as a result of the Absolute Funds' and the defendants' trading in ProElite.

(n)     The Absolute Funds purchased another $25 million in shares and warrants of Pro Elite in June 2007, based on public documents and SEC filings. Records from the Absolute Funds expected to be introduced at trial show that Heatherington signed the wire instructions authorizing the release of the Absolute Funds' monies to purchase the Pro Elite shares.

(o)     From his review of the trading records pertaining to the Penny Stock Companies, Cangiano is expected to testify that, over the period from at least September 2004 through September 2007, the prices of the Penny Stocks were not left to the normal market forces of supply and demand, but were instead manipulated through various devices and contrivances engineered or carried out by the co-conspirators, including wash sales, matched orders, marking the close, and pre-arranged cross-trading between the Absolute Funds and sometimes Hunter World, CIC Global, and The Hunter Fund. For example, the instant message and trading records show that between approximately April and August 2007, trades were placed through Hunter World to keep the closing price of Berman Center for the month between $2.50 and $4.00 per share but, after Homm's resignation and Heatherington's departure from ACMH in September, the co-conspirators were no longer propping up the price of Berman Center stock and it dropped to as low as $0.55 per share by December 22, 2007.

Exhibit 2
Page 15 of 17

(p)     Cangiano is also expected to testify that this manipulative trading by the co-conspirators caused the prices of Penny Stocks to rise, and caused the investors in the Absolute Funds to pay artificially excessive prices for their positions.  These prices also were incorporated into the Absolute Funds' position reports and financial records.  The result of these arrangements caused the holders of the Absolute Funds to pay artificially excessive prices for their positions.  Further, the inflated prices also had the effect of altering the NAV for the Absolute Funds in question.  These NAVs were reflected in the Absolute Funds periodic reports and marketing material, thereby deceiving investors in the affected Absolute Funds as to the true value of the Absolute Funds' portfolios.  Ultimately, it was the hedge funds investors who realized the losses from the use of typical artificial devices designed to alter the free forces of supply and demand.

(q)     Cangiano is expected to opine that, due to the nature of trades that the co-conspirators placed to drive up and sustain the artificial prices, the Absolute Funds would not have been (and were not) able to liquidate or dispose of their holdings in the Penny Stock Companies at the prices that their own activity had created, because there was little or no demand for the stocks outside of the co-conspirators and the Funds at those artificial prices. Cangiano is expected to cite to the September 19, 2007, ACMH press release, which was issued the day after Homm's sudden departure, which stated that the ACMH Board had begun a review of the equity fund business, in particular "the investment funds previously under Florian Homm's immediate control," and had discovered the illiquid nature of the securities holdings, particularly those that traded on the "US-based Over the Counter Bulletin Board/Pink Sheets," and had frozen redemptions in the Absolute Funds for a 12-month period.  Cangiano is also expected to rely on the testimony of Glenn Kennedy that described the subsequent restructuring of the equity funds, and the efforts made to liquidate the Penny Stock Companies' securities, all of which ultimately were either written off or sold for small fractions of the values at which they were carried on the Absolute Funds' books.

Exhibit 2
Page 16 of 17

(r)     Finally, Cangiano is expected to opine that, while the investors in the Absolute Funds were most affected by the manipulative trading and ultimately bore substantial losses on the Absolute Funds' purchases of the Penny Stocks, co-conspirators' actions also had a deleterious effect on the overall marketplace.   The use of devices such as wash sales, matched orders, and marking the close have the effect of giving the investing public the illusion that published prices and volume figures were established in a free and open market.  Such was not the case here since prices and transactions were orchestrated by the defendants and were not set by an unfettered market.  Investors in general often rely on market data to make important investment decisions and have a right to expect market data to accurately reflect the perceived value of a company based on actual prices that other investors are willing to pay. The use of artificial devices for whatever purpose serves to deny the public that right.

Exhibit 2
Page 17 of 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 3

## CANGIANO TESTIMONY SUMMARY – REVISED 20190528

James M. Cangiano is an expert in the United States and global securities industry and the laws and regulations governing securities transactions in the United States.  Cangiano has 47 years' experience in the securities industry, including employment from in or about 1972 through 2004 at the National Association of Securities Dealers ("NASD"), the predecessor entity to the Financial Industry Regulatory Authority ("FINRA").  Among other things, from 1986 through 1999, Cangiano was Senior Vice President of Market Regulation for the NASD.  In that role, Cangiano was the senior executive in charge of policing the "Over the Counter Bulletin Board" (or "OTCBB") and the Nasdaq Stock Market, which required him to establish surveillance and examination policies and procedures for the NASD in the area of small cap and micro-cap fraud.  Cangiano was also responsible for working to establish regulatory policy for trading practices involving the OTC market.  Mr. Cangiano is an expert in the rules and regulations that govern trading on the domestic national exchanges, such as the New York Stock Exchange and Nasdaq Stock Market, as well as the domestic OTC markets.  Given his extensive regulatory background, he is qualified to analyze trading data and to give an expert opinion to identify certain "earmarks" commonly present in trading and surrounding circumstances where findings of market manipulation have been found.  Cangiano is expected to provide an overview of the securities markets and generally identify the hallmarks of market manipulation schemes and reflect them in connection with the facts of this case, in sum and substance, as follows:

1.      In a free and open market, prices for securities are set by the forces of supply and demand.  A free market is generally characterized as one "where prices may be established by the free and honest balancing of investment demand with investment supply."  In most instances, securities are widely traded by numerous independent buyers and sellers who bring their collective judgments to bear regarding the perceived value of a security.  These buyers and

Exhibit 3
Page 1 of 16

sellers appear to and generally do possess legitimate economic motives for entering into a transaction.

2.      Under the securities laws, investors have the right to expect that the market in which they are buying or selling securities is free of artificial interference and is based on a combination of the present and future successes of the issuer and other informed investors coming together to buy or sell based on an accurate mix of issuer and market information then currently available.  The rules of the Securities and Exchange Commission, FINRA, and the national securities exchanges and associations require that significant disclosures be made regarding the nature of an issuer of securities, its business, and its finances.  The exchanges require listed companies to file periodic reports and to announce publicly the existence of material news that might affect the underlying value of the security.  In a free market, buyers and sellers make investment decisions based on a company's disclosures and their perception of the company's prospects for the future.  In general, market manipulation (causing share prices to increase or decrease for reasons not caused by free market forces but through artificial means) has been found to be an act of deceit and fraud because it causes stock prices to be falsely reported.  Based on this deceit or falsehood, buyers and sellers may enter into transactions which they would not normally have entered into (absent the false information) and which may result in pecuniary loss.

3.      The closing price of a security, based on the last sale of the day, is of particular interest to investors as it represents the last reported transaction of the day. Among other things, the last sale of the day or month is widely disseminated to the investing public, both electronically and in print, to allow current and prospective investors to readily ascertain the underlying economic value of the security in question.  The last sale of the day is used in assessing trends in the market performance of the security.  In the context of a hedge fund, the last sale of the last day of the month is extremely important in determining a fund's performance measured by both the fund's Net Asset Value ("NAV") and the unrealized gains on the assets held within a fund's portfolio.  The monthly, quarterly, and year-end NAV for a fund is then

Exhibit 3
Page 2 of 16

used to calculate the fund's share price when new investors want to buy-in or when existing shareholders seek to redeem shares of the fund.  Fund prospectuses, proxy soliciting materials, periodic reports and newsletters typically reflect those prices to current and prospective shareholders.  Thus, when the stock prices used to calculate a fund's NAV have been artificially set, the effect is that investors are misled as to the value of the fund.

4.     There is no exhaustive list of elements that could make up market manipulation schemes because, as U.S. courts have recognized, the antifraud laws are designed to "encompass the infinite variety of devices that are alien to the climate of fair dealing."  Herpich v. Wallace, 430 F.2d 792, 802 (5th Cir. 1970).  Essentially, market manipulation is a willful attempt by the participants to interfere with the free market forces of supply and demand, and may involve a variety of techniques.  There are common elements of market manipulation schemes, however, that often are present as they relate to the trading of micro- and small-cap OTC stocks  Those "classic" devices include the following:

a.     "Wash sales" are "sales of securities made at about the same time as a purchase of the same . . .  resulting in no change of beneficial ownership."  A "matched order" is an "order to buy and sell the same security, at about the same time, in about the same quantity, and at the same price."  Wash sales and matched orders are offsetting buy and sell orders that are used to create the impression of apparent activity of market demand for a security.  Wash sales and matched orders are explicitly defined as manipulative in Section 9 of the Securities Exchange Act of 1934, 15 U.S.C. § 78i.

b.     "Marking the close," refers to a practice known in the securities industry as attempting to influence or control the closing price of a stock by executing purchase or sale orders at or near the close of the market.  Interference in the market to establish a particular last sale of the day price were done, for example, in an effort to increase the price or demand for a stock, is deceptive and therefore detrimental to investors and the market in general. Marking the close transactions usually involve actual trades but may also involve wash sales or matched orders.

Exhibit 3
Page 3 of 16

    c.  A key indicator of marking the close is a pattern of trades occurring at or near the close of the market that have the effect of influencing or establishing the closing price that day.  A pattern of up ticks or down ticks at the close of the market that occur over a period of time may also be indicative of an effort to mark the close.  A distinct pattern of activity by the same parties could indicate that they are attempting to affect the price at which the stock will close, given some pecuniary purpose.

    d.  Where the same market participant consistently establishes the closing price is another key indicator of an attempt to "mark the close."  Generally, these closing trades do not make economic sense particularly when a participant places orders for a security at a price higher than what would be available in the market, because it requires the participant to pay more than needed for the security.  Accordingly, the hallmarks of a "marking the close" scheme include a pattern of trading above (or below) the market at the close of the day or month, with significant motivation or pecuniary interests in doing so.

    5.  Market-related schemes often involve the securities of issuer companies that are small and thinly capitalized with few assets, little or no operating history, inexperienced management and no real business plan, or may involve an ongoing business concern in need of capital, restructuring, or a new business plan.  These companies are selected because they not generally known to the investing public.  Because of the lack of genuine investor interest, it is easier for the scheme participants to dominate and control the trading of their securities.

    6.  The scheme participants need to have a publicly traded entity in order to quickly access public markets to permit them to sell their own stock.  For these reasons, another common practice is to acquire a public "shell" company, which generally is a dormant company with little or no assets, little or no operations, but that has value because it has a trading symbol and immediate access to public markets.

    7.  Scheme participants often will identify a small company ("target company"), and merge it with the shell company that is already publicly traded.  One indicia of such a scheme is when the target company has little or no operating history, inexperienced management, a limited

Exhibit 3
Page 4 of 16

business plan, and no public following, so there is no obvious reason why the company would benefit from access to public capital, yet such company acquires a shell public company in order to effect what is called a "reverse merger." Depending on the structure of the deal, the target company or the shell itself may become the surviving entity. In either case, the net result is the same: the scheme participants end up with a publicly traded entity; acquire substantial amounts of the stock at little or no cost where the shares of which can now be sold into a marketplace, which has been artificially interfered with by the participants.

8.      PIPE ("Private Investment In Public Equity") transactions have been found to be used in market-related schemes. PIPE transactions, in which a private investor buys a publicly traded stock in a private transaction, are a lawful method of financing, but the SEC has initiated a number of proceedings into abuses in the PIPE area. PIPE transactions involve unregistered securities usually in the form of common, preferred, or convertible shares. The possibilities of manipulation are heightened because the securities are low priced and the securities are not publicly known. Indeed, promoters paid in shares have an opportunity to pump up the price of the securities and then sell restricted shares of the securities into the public market at inflated prices.

9.      Securities regulators and courts have laid out some general criteria to establish whether a market is dominated and controlled by a particular broker-dealer. Relevant to the determination of whether a firm dominates and controls a market for a security is whether a particular broker/market maker underwrote the security and sold a substantial percentage of the offering to its own customers, whether the firm was responsible for significant trading in the aftermarket, and whether the remaining amount of aftermarket trading was fragmented among other dealers. If a market maker has the ability to control prices, it can artificially set them higher through price leadership. Paying increasingly higher prices for a security, and bidding up a stock or causing it be bid up, are well-established techniques used by participants in a market-related schemes. In a market where the floating supply is small, purchases of securities at increasing prices have an especially significant impact on price. Price rigging may be

Exhibit 3
Page 5 of 16

accomplished by a market maker who places successively higher bids for the stock as part of an orchestrated plan to push the stock price higher.

10.     Cangiano is expected to testify that a broker (such as ACMH's prime brokers) may extend credit to their investors by way of a margin account.  Securities in a margin account are purchased with cash loaned to the investor where the securities themselves are used as collateral.  Margin is the amount of "down payment" that an investor must make in a margin purchase and is usually expressed as a percentage.  For example, if a security were priced at $20 per share, a margin investor purchasing 100 shares would only have to deposit $10,000.  The remaining $10,000 would be lent to the investor by his broker.  The securities holdings in a "margin" account are valued ("marked to market") daily to insure that the account has sufficient equity ("maintenance margin") (the total value of the securities in the margin account minus what has been borrowed from the broker) to remain above the minimum level required by industry regulators (25%) or higher levels required by individual brokerage firms.

11.     Cangiano is further expected to testify that a "margin call" would occur if the equity fell below the appropriate maintenance level.  Failure to maintain the required maintenance margin would result in mandating that the investor deposit additional cash or securities into the account when the value of the underlying securities is not sufficient to adequately maintain the required margin maintenance amount. For example, if the position referenced above was marked to market at $10,000, this would result in zero equity in the account ($10,000 minus $10,000) and the account would be under margined.  If additional assets are not deposited to bring the account to the required maintenance, the broker has the right to begin liquidating securities in the account until it meets the appropriate levels. This may be done at the broker's discretion without the consent of the customer as regards the timing of the trades or the securities liquidated.

12.     Cangiano has reviewed, among other things, the following: Hunter World trading blotter; trading records maintained by the Absolute Funds; trading records maintained by FINRA; Bloomberg instant messages ("IMs") and emails maintained by Hunter World; Tony

Exhibit 3
Page 6 of 16

Ahn's Windows IMs; various SEC filings by the Penny Stock Companies; and email communications maintained by Hunter World and ACMH, all of which are expected to be introduced into evidence at trial. Cangiano has reached certain opinions regarding the trading that took place at Hunter World at issue in this case. Based on his review and analysis, as well as his background and expertise, Cangiano is expected to testify to the principal opinions and conclusions set forth below.

       a.    Ficeto, Colin Heatherington ("Heatherington"), and Homm possessed an ability to influence the market prices of the securities in question through their domination and control of the market for those securities and their apparent de facto control over the accounts of the Absolute Funds. For example, to ensure their ability to control the market for the Penny Stocks, Ficeto identified companies with scant investor interest, typically caused them to be reverse merged with publicly traded shell companies and, with Homm and Heatherington, caused the Absolute Funds to buy massive quantities of their shares in PIPE transactions, which shares later were registered for public trading. As part of these deals, Ficeto also generally negotiated lock-up agreements with the Penny Stock Companies' directors, executive officers and/or then-existing shareholders to withhold their shares from trading in the market for a period of time. These lock up agreements had the effect of giving the participants and the Funds control of all or nearly all of the tradeable shares. Typically, when the lock up agreements expired and the insiders attempted to sell their shares, the effect would be that the price of the shares would fall substantially. For example, through matched trades, the participants kept the closing price of Micromed at or nearly $4.00 per share until March 30, 2007 but after the lock out agreements expired on or about April 1, 2007, the stock began an inexorable slide and by April 23, 2007, the share price had dropped as low as $0.32 per share.

       b.    The participants used techniques that have been recognized by the SEC, FINRA and U.S. courts as "manipulative devices," including wash sales and matched orders, and thereby caused the reported prices and trading volumes of the Penny Stocks to be artificially set rather than be established through the free forces of supply and demand. Their effect on the

Exhibit 3
Page 7 of 16

market for the securities of the Penny Stock Companies was substantial in that it gave the appearance of an active market for the securities in question when, in fact, the defendants dominated the trading volume in those securities and inflated the reported trading volume and price of the securities through artificial means.

        c.      Transactions executed near the end of the trading day made through Hunter World, including cross trades between various Absolute Funds, had the effect of setting the closing prices of the securities of the Penny Stock Companies on those dates, characteristic of a practice known by industry professionals and securities regulators as "marking the close."

        d.      Generally in most market-related schemes, members of the public are the victims of the artificial pricing, because they are generally induced to buy shares at above-market prices.  For example, in what is colloquially referred to as a "pump and dump" scheme, conspirators often cause false and misleading press releases to be issued, which purport that the issuers have made an "important" breakthrough or discovery.  Such public disclosures are intended to "pump" up the stock and bring investors into the market to act as contra parties to sales being made by the participants from their positions (when conspirators then "dump" their shares).  This "contra party" (or third-party) liquidity, provided by innocent investors, is generally what enables participants to profit from selling their cheap stock.  In this case, however, the (contra party) liquidity was provided by the Absolute Funds, which purchased and sold shares of the stock strictly amongst the family of funds at any prices that were artificially set.  The effect was to raise the price of the securities in question resulting in the funds purchasing and selling stock at prices which did not reflect the free forces of supply.

        e.      The trades that were placed in the Penny Stocks show that the participants were not rational and had little or no economic purpose, yet the Absolute Funds purchased the Penny Stocks at artificial prices; that is, the Absolute Funds repeatedly paid artificially set prices for the Penny Stocks. The share prices of the Penny Stocks did not reflect consideration for the lack of economic success of the Penny Stock Companies, all of whom repeatedly posted substantial losses during the period in question.   None of the Penny Stock Companies was

Exhibit 3
Page 8 of 16

profitable but nonetheless they managed to achieve significant market valuations based on cross trading between and among the Absolute Funds.  Notwithstanding their poor business prospects, the defendants caused the Absolute Funds to purchase additional shares of the Penny Stock Companies, even when the Absolute Funds already held substantial positions in those securities.

       f.     Heatherington and Ahn's instant messages were not part of HWM books and records and these (IMs) demonstrate that the purpose of the trades was setting or maintaining certain stock prices, and had a direct impact on the publicized Funds' valuations.

       g.     For example, Heatherington expressly requested that Ahn trade as necessary to achieve certain prescribed prices, at times Heatherington mentioned that this motivation was to affect the Funds' published financial results:

       (1)     On October 11, 2006, Ahn, using the private Windows IM system, sent a message to Heatherington confirming that "the print [meaning the stock price as reflected on the public listing systems] in [ProElite would] change in the next couple of days. Heatherington replied, "ok, the sooner the better, we need it to release the NAVs."

       (2)     On September 20, 2006, using the private Windows IM system, Heatherington instructed Ahn to have "AIF" [Absolute India Fund] buy 800,000 shares of Logistical Support at $0.17, stating: "AIF needs a bit of performance."  Ahn confirmed that he would "put it after 30 minutes after the close to make it less conspicuous."

       (3)     The sales to, and trading among, the Absolute Funds permitted Ficeto, Homm and Heatherington to sell their individually-controlled shares of the Penny Stocks to the Absolute Funds at substantial profits and provided significant economic motivation to undertake many of the cross-trades between the Absolute Funds.

       i.     These actions had substantial effect on the Absolute Funds, and investors in the Absolute Funds, in the following ways:

       (1) Hunter World Market, Homm, Heatherington, and Ficeto accounted for the predominance of the trading volume in the Penny Stocks and caused the Absolute Funds to buy and sell shares repeatedly through cross-trades they authorized.  Many of these trades also

Exhibit 3
Page 9 of 16

consistently had the effect of marking the close of the market for those securities, invariably at month end. This timing was significant because the calculation of the Absolute Funds NAVs was performed by each fund's administrator on "Valuation Day," which was defined in the Absolute Funds' offering memoranda as being "the last calendar day of each month and/or such other days as the Directors in their absolute discretion may determine." Indeed, the IMs and trading records show that Heatherington repeatedly directed Ahn to make trades in order to obtain certain month and quarter ending closing prices that Heatherington had previously dictated.

(2)     The effect of the month-end trades was almost always to increase or sustain prices of the Penny Stocks. The Absolute Funds' prospectuses, periodic reports and marketing material all reflected these prices and caused the NAVs of many of Funds to increase as a result. Even by trading a very small quantity of one of the Penny Stocks at the end of the month, when multiplying these artificial prices by the large number of shares that the Absolute Funds held in the Penny Stocks, the Funds claimed large unrealized gains in the book values of the Penny Stock holdings, which had material effects on the Funds' NAVs.

(3)     The Absolute Funds investors therefore received the Absolute Funds' published financial reports that were based on the prices dictated by Heatherington. Because the Funds' published NAVs were calculated using then-current market prices for the Penny Stocks, and because those published prices had been arranged by the participants, the Funds financial reports were affected by these actions.

(4)     The Absolute Funds investors were also told by the prospectuses of the Absolute Funds, that the Funds were being professionally managed and invested in certain classes of assets, with appropriate oversight as to stock selection and risk management. In fact, Homm, Heatherington and Ficeto, acting with and through Ahn, committed millions of dollars of the Absolute Funds' assets to OTC securities that were speculative, unseasoned, inappropriate for the Funds' stated mandates, and, because of their own actions, in limited supply.

(5)     Through the repeated trading of the securities of the Penny Stock Companies between the Absolute Funds, the participants had the effect of having the Absolute

Exhibit 3
Page 10 of 16

Funds incur unnecessary and excessive expenses, including brokerage commissions and other fees. This resulted in a direct deprivation to the Absolute Funds, and some of these commissions went directly to Homm and Ficeto, as co-owners of the broker-dealer Hunter World.

(6)     In typical fashion, because there was generally no market for these securities other than the Funds, the Funds were stuck with these virtually worthless securities after the scheme collapsed.

(7)     The overstatements of the NAVs of the Absolute Funds had the effect of distorting both the purchasing and redemption value of the Absolute Funds. Because the NAVs were used to value the price of purchasing or redeeming shares of a Fund, the inflated financial reports distorted both the purchasing and redemption value of the Funds. Accordingly, incoming shareholders paid too much and redemptions had hidden premiums based on the inflated figures at which the Absolute Funds valued their positions in the Issuers. The remaining shareholders in the Absolute Funds, in effect, underwrote those redemptions. The actual effects of the participants' actions left the Absolute Funds holding between $440 and $530 million in illiquid securities, securities they could not sell due to the fact that the artificial market had collapsed, for the U.S. microcap stocks purchased and traded by the Absolute Funds through Hunter World. Outside of the funds' trading, those securities proved to be practically worthless.

(8)     The financial reports also caused excessive management and performance fees to be paid to ACMH (and derivatively, to the ACMH executives and employees). The performance and management fees were paid as a percentage of the values of the Funds; because the Funds were artificially overvalued, ACMH was overpaid, at the expense of their clients, the Absolute Funds.

(9)     Investors in the publicly-traded firm ACMH were also misled by the exaggerated published financial reports of the Absolute Funds. Reports prepared by stock analysts who followed the ACMH stock looked to the performance of the various Absolute Funds to value ACMH. Accordingly, investors who purchased ACMH shares in the public markets were also affected. When the true state of the Funds' financials was uncovered in

Exhibit 3
Page 11 of 16

September 2007, ACMH's share price dropped precipitously and the ACMH investors lost money.

(j)     The numerous Windows IMs between Heatherington and Ahn were primarily used by them to set artificial prices for the Penny Stocks in the marketplace. Heatherington would direct Ahn as to what trades to execute and what prices to establish.  There are many instances of directives given by Heatherington, through Ahn, and approved by Ficeto, that illustrate the participants' use of wash trades, matched orders, and orders marking the close of the market.

(k)     Cangiano is expected to point to examples within the trading records and IMs to support his testimony. For example:

(1)     As confirmed by SEC records, in September 2006, Homm caused five Absolute Funds to spend approximately $10 million to purchase more than 4 billion shares of ProElite and more than 3 million warrants to purchase ProElite shares exercisable at $0.004 per share.  ProElite also issued shares to Hunter World and to Ficeto's minor children, and to CIC Global.  In January 2007, ProElite filed a registration statement to register these shares with the SEC; the registration statement became effective, meaning the shares were registered to trade on the open market, on May 14, 2007.

(2)     As reflected in the IM records, on May 15, 2007, Heatherington directed that all written confirmations of the May 15, 2007 transactions in ProElite (whose ticker symbol was PELE) be sent only to him, as follows:

**Heatherington**:  PELE confirms to me only today pls [please].

**Ahn:**  got it, I will make sure it goes only to your Hotmail.

(3)     Cangiano is expected to testify that this IM exchange, which was to ensure that the trade confirmations would not been sent to ACMH through the normal channels but be sent to Heatherington's private e-mail, is consistent with the conclusion that the trades were prearranged, and resulted in Heatherington and Ficeto related accounts liquidating there positions at substantially higher prices.

Exhibit 3
Page 12 of 16

(4)     After the May 15, 2007 email, Hunter World executed the following trades, all of which occurred after the close of the market on that same day and within a span of minutes:

| Account Name | Buy or Sell | Execution Time | Volume | Price | Total Proceeds |
|---|---|---|---|---|---|
| Activist Value Fund | S | 16:36 | 500,000 | $3.20 | $1,600,000 |
| Octane Fund | B | 16:36 | 500,000 | $3.30 | $1,650,000 |
| Large Cap Fund | S | 16:36 | 600,000 | $3.20 | $1,920,000 |
| East West Fund | B | 16:36 | 600,000 | $3.30 | $1,980,000 |
| European Catalyst Fund | S | 16:36 | 3,000,000 | $3.20 | $9,600,000 |
| Return Europe Fund | B | 16:36 | 3,000,000 | $3.30 | $9,900,000 |
| CIC Global (HEATHERINGTON) | S | 16:38 | 140,000 | $7.99 | $1,118,600 |
| Hunter World | S | 16:38 | 800,000 | $7.99 | $6,392,000 |
| Return Europe Fund | B | 16:38 | 940,000 | $8.05 | $7,567,000 |
| T.F. as custodian for his minor daughter | S | 16:40 | 5,000 | $11.99 | $59,950 |
| T.F. as custodian for his minor daughter | S | 16:40 | 5,000 | $11.99 | $59,950 |
| Return Europe Fund | B | 16:40 | 10,000 | $12.05 | $120,500 |

(5)     In summary, in a span of minutes, Heatherington and the participants, who were the only parties to hold tradeable shares of ProElite, executed trades at successfully higher prices for ProElite stock from $3.20 to $12.00, and then sold portions of their personal ProElite stock holdings to the Return Europe Fund at the higher prices.  Colin Heatherington caused the Return Europe Fund to purchase 140,000 shares from CIC Global, the company that he owned with his brother, at the price of $7.99, Heatherington effectively liquidating this position at a substantial profit.

(6)     On May 16, 2007, using the Windows IM system, Ahn noted that Bloomberg was publicly reflecting the volume from the previous day's cross-trades.  He told Heatherington:

**Ahn:**     " just fyi, looks like certain pages of Bloomberg are showing stuff from PELE."

**Heatherington**: "perfect, hope it stays that way"

Exhibit 3
Page 13 of 16

(l)      These messages indicate that another outcome of placing these cross-trades was to publicly disseminate artificial information to the market – that is, what appeared to be substantial trading volume in ProElite, was, in fact, artificially created by the participants, in a security where they accounted for almost 100% of the trading volume. Because there was no public demand for the stock, any apparent increase in market price was a direct result of these pre-arranged cross-trades.

(m)      Trading records also show that Heatherington and Ficeto employed matched orders to liquidate their personal holdings and sell them to the Absolute Funds at the inflated prices.  Between May 15, 2007, when the Absolute Funds' and the co-conspirator's shares became registered to trade, and September 19, 2007, when Homm resigned, approximately 1.2 million shares of ProElite were sold by accounts controlled by Heatherington and Ficeto at around $15 per share for total proceeds of around $18 million.  This does not include the sales commissions and credits which accrued to Hunter World as a result of the Absolute Funds' and the defendants' trading in ProElite.

(n)      The Absolute Funds purchased another $25 million in shares and warrants of Pro Elite in June 2007, based on public documents and SEC filings.  Records from the Absolute Funds expected to be introduced at trial show that Heatherington signed the wire instructions authorizing the release of the Absolute Funds' monies to purchase the Pro Elite shares.

(o)      From his review of the trading records pertaining to the Penny Stock Companies, Cangiano is expected to testify that, over the period from at least September 2004 through September 2007, the prices of the Penny Stocks were not left to the normal market forces of supply and demand, but, instead through various devices and contrivances used by the participants, were artificially set.  The devices employed included wash sales, matched orders, and marking the close, between the Absolute Funds and sometimes Hunter World, CIC Global, and The Hunter Fund.  For example, the instant message and trading records show that between approximately April and August 2007, trades were placed through Hunter World, which had the

Exhibit 3
Page 14 of 16

effect of keeping the closing price of Berman Center for the month between $2.50 and $4.00 per share but, after Homm's resignation and Heatherington's departure from ACMH in September, the participants were no longer involved in Berman Center stock and it dropped to as low as $0.55 per share by December 22, 2007.

(p)     Cangiano is also expected to testify that the trading by the participants had the effect of causing the prices of Penny Stocks to rise, and caused the investors in the Absolute Funds to pay artificially excessive prices for their positions.  These prices also were incorporated into the Absolute Funds' position reports and financial records.  The result of these arrangements caused the holders of the Absolute Funds to pay artificially excessive prices for their positions.  Further, the inflated prices also had the effect of altering the NAV for the Absolute Funds in question.  These NAVs were reflected in the Absolute Funds periodic reports and marketing material, thereby deceiving investors in the affected Absolute Funds as to the true value of the Absolute Funds' portfolios.  Ultimately, it was the hedge funds investors who realized the losses from the use of typical artificial devices designed to alter the free forces of supply and demand.

(q)     Cangiano is expected to opine that, due to the nature of trades that the participants placed to create the artificial prices, the Absolute Funds would not have been (and were not) able to liquidate or dispose of their holdings in the Penny Stock Companies at the prices that their own activity had created, because there was little or no demand for the stocks outside of the participants and the Funds at those artificial prices.  Cangiano is expected to cite to the September 19, 2007, ACMH press release, which was issued the day after Homm's sudden departure, which stated that the ACMH Board had begun a review of the equity fund business, in particular "the investment funds previously under Florian Homm's immediate control," and had discovered the illiquid nature of the securities holdings, particularly those that traded on the "US-based Over the Counter Bulletin Board/Pink Sheets," and had frozen redemptions in the Absolute Funds for a 12-month period.  Cangiano is also expected to rely on the subsequent ACMH press releases that described the restructuring of the equity funds, and the efforts made to liquidate the Penny Stock Companies' securities, all of which ultimately were either written off

Exhibit 3
Page 15 of 16

or sold for small fractions of the values at which they were carried on the Absolute Funds' books.

(r)     Finally, Cangiano is expected to opine that, while the investors in the Absolute Funds were most affected by the trading and ultimately bore substantial losses on the Absolute Funds' purchases of the Penny Stocks, participants' actions also had a deleterious effect on the overall marketplace.   The use of devices such as wash sales, matched orders, and marking the close have the effect of giving the investing public the illusion that published prices and volume figures were established in a free and open market.  Such was not the case here since prices and transactions were dictated by the defendants and were not set by an unfettered market. Investors in general often rely on market data to make important investment decisions and have a right to expect market data to accurately reflect the perceived value of a company based on actual prices that other investors are willing to pay. The use of artificial devices for whatever purpose serves to deny the public that right.

Exhibit 3
Page 16 of 16