NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
Assistant United States Attorney
Deputy Chief, General Crimes Section
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Major Frauds Section
IAN V. YANNIELLO (Cal. Bar No. 265481)
General Crimes Section
     1500/1100/1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0363/6527/3667
     Facsimile: (213) 894-6436/6269
     E-mail:    cassie.palmer@usdoj.gov
                scott.paetty@usdoj.gov
                ian.yanniello@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>TODD MICHAEL FICETO,<br><br>　　　　Defendant. | No. CR 13-183-VAP<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT TODD MICHAEL FICETO'S OBJECTIONS TO THE PRESENTENCE REPORT<br><br>Hearing Date: May 1, 2020<br>Hearing Time: 9:00 a.m.<br>Location:　　Courtroom of the Hon. Virginia A. Phillips |

　　　　Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cassie D. Palmer, Scott Paetty, and Ian V. Yanniello, hereby files its Response to Defendant Todd Michael Ficeto's Objections to the Presentence Report.

This response is based upon the attached memorandum of points and authorities and exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 20, 2020                Respectfully submitted,

                                            NICOLA T. HANNA
                                            United States Attorney

                                            BRANDON D. FOX
                                            Assistant United States Attorney
                                            Chief, Criminal Division

                                                 /s/
                                            CASSIE D. PALMER
                                            SCOTT PAETTY
                                            IAN V. YANNIELLO
                                            Assistant United States Attorneys

                                            Attorneys for Plaintiff
                                            UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.      INTRODUCTION..................................................1

II.     ARGUMENT......................................................1

     A.   The Appleby Report Is a Reliable Basis for Calculating
             Loss.....................................................1

     B.   The Two-Level Enhancement for Sophisticated Fraud that
             Occurred Overseas Is Warranted...........................4

     C.   Two-Level Enhancements for Money Laundering and for
             Sophisticated Money Laundering Are Warranted.............6

     D.   The Three-Level Aggravating Role Enhancement Is
             Warranted................................................8

     E.   The Two-Level Enhancement for Obstruction of Justice
             Is Warranted............................................10

     F.   A Restitution Order of $215,815,031 is Proper and
             Defendant Should be Credited $14,954,265.50 for Prior
             Payments to the Absolute Funds..........................11

III. CONCLUSION...................................................13

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Federal Cases**

United States v. Adargas
  366 F.3d 879 (10th Cir. 2004)......................................6

United States v. Alalade,
  204 F.3d 536 (4th Cir. 2000).....................................12

United States v. Anderson,
  580 F.3d 639 (7th Cir. 2009)......................................8

United States v. Doe,
  778 F.3d 814 (9th Cir. 2015)......................................8

United States v. Holden,
  908 F.3d 395 (9th Cir. 2018)......................................9

United States v. Kent,
  821 F.3d 362 (2d Cir. 2016).......................................9

United States v. Laurienti,
  611 F.3d 530 (9th Cir. 2010)......................................3

United States v. Navarrete,
  667 F.3d 886 (7th Cir. 2012).....................................12

United States v. Newman,
  659 F.3d 1235 (9th Cir. 2011)....................................11

United States v. Pescatore,
  637 F.3d 128 (2nd Cir. 2011).....................................12

United States v. Rose,
  20 F.3d 367 (9th Cir. 1994).......................................9

United States v. Rutkoske,
  506 F.3d 170 (2d Cir. 2007).......................................3

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Tavares,
   705 F.3d 4 (1st Cir. 2013)........................................ 8

United States v. Whitney,
   673 F.3d 965 (9th Cir. 2012)...................................... 8

United States v. Zolp,
   479 F.3d 715 (9th Cir. 2007)...................................... 2

**Federal Statutes**

18 U.S.C. § 1957................................................... 6
18 U.S.C. § 3663(j)(2)(A)......................................... 12
18 U.S.C. § 3664(f)(1)(A)......................................... 11
18 U.S.C. § 3664(f)(1)(B)......................................... 11
18 U.S.C. §  1956(h)............................................... 6

**Federal Rules**

U.S.S.G. § 2B1.1................................................... 3
U.S.S.G. § 2B1.1(b)(10)............................................ 4
U.S.S.G. § 2B1.1(b)(10)(C)......................................... 5
U.S.S.G. § 2S1.1(b)................................................ 6
U.S.S.G. § 3B1.1(b).......................................... 8, 9, 10
U.S.S.G. § 3C1.1.................................................. 10
U.S.S.G § 1B1.3(a)(1)(B)........................................... 2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant raises several objections to the PSR, none of which merit a change in his applicable Guidelines calculation. As the government previously noted, defendant's objections to the PSR are untimely, and he offers no justification for the late filing other than his own unwillingness to meet with Probation. (Dkt. 299 at 1-2.) If the Court considers the untimely objections, none have merit. The government has provided the Court with reliable evidence in support of its loss figures and resulting offense-level enhancements, including enhancements based on overseas conduct, money laundering, role in the offense, and obstruction of justice.

Defendant's restitution order should be for the full loss amount sustained by the Absolute Funds; however, defendant should receive credit for assets that he and Sean Ewing (a former employee of the Absolute Funds) have forfeited and returned to the victim Absolute Funds. Consequently, the government continues to believe that the applicable total offense level is 43, and that a sentence of 96 months' custody, and a restitution order of $215,815,031 is justified in this case.

**II.  ARGUMENT**

**A.  The Appleby Report Is a Reliable Basis for Calculating Loss**

The government has provided the Court with a detailed report, the Appleby Report (see Dkt. 289), filed under seal, that sets forth a calculation for the actual loss the victim Absolute Funds sustained from the fraud scheme that defendant and his co-conspirators executed -- $215,815,031. As defendant acknowledges, the standard for loss calculations is not "absolute precision," but rather "a reasonable

estimation." <u>United States v. Zolp</u>, 479 F.3d 715, 719 (9th Cir. 2007).  Contrary to defendant's assertions (Dkt. 301 at 10-11), actual losses must include the inflated management and performance fees that the victim Absolute Funds paid <u>as a result of</u> the fraud. These fees were part of the compensation package afforded to co-conspirator Florian Homm, who was paid a higher amount based on fake profits generated by the co-conspirators stock manipulation.  The fact that defendant did not personally share in the enhanced management and performance fees the Absolute Funds paid to Homm is irrelevant.  "[I]n the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" shall be factored in when calculating a defendant's offense level.  U.S.S.G § 1B1.3(a)(1)(B).  Defendant was an investment advisor and managed the Hunter Fund, a hedge fund that was used to conceal penny stock investments, and for which defendant was entitled to receive management and performance fees.  Whether defendant did in fact pay himself management and performance fees out of the Hunter Fund does not alter the fact that defendant knew that such fees were customary for hedge fund managers, and thus was aware that enhanced management and performance fees the Absolute Funds paid to Homm were the natural and foreseeable consequence of his scheme to inflate and manipulate penny stocks.

   Defendant's primary challenge to the Appleby Report is that it does not "disaggregate" the loss due to the fraud with losses purportedly caused by other market forces and/or account for the effect of the Absolute Funds' immediate sales of the penny stocks once the fraud was discovered.  (Dkt. 301 at 5, 7-9.)  Defendant

1  argues that the lack of inclusion of several factors that the Court
2  is permitted, but not required to consider, renders the loss
3  indeterminable.  This is not the law, nor is it justice in this case.
4  "All methodologies for estimation have inherent imperfections;
5  otherwise they would be precise calculations, not estimates.  So long
6  as those imperfections are logical and are not prone to overwhelming
7  the final result, they are permissible."  United States v. Laurienti,
8  611 F.3d 530, 559 (9th Cir. 2010).

9  Defendant seeks to inject unnecessary complexity into the
10 Court's loss analysis when it is not needed in this case.  Market
11 forces "can" be considered but the law does not require the Court to
12 weigh event studies in every securities fraud case.  The Guidelines
13 require that the Court engage in a "reasonable estimate of loss" that
14 will be afforded "appropriate deference."  U.S.S.G. § 2B1.1, comment.
15 (n.3(C)).  Indeed, the Second Circuit has held that "[d]etermining
16 the extent to which a defendant's fraud, as distinguished from market
17 or other forces, caused shareholders' losses inevitably cannot be an
18 exact science."  United States v. Rutkoske, 506 F.3d 170, 179 (2d
19 Cir. 2007).  The Appleby Report specifies the mechanics and
20 methodologies of the Absolute Funds' analysis of their loss (Appleby
21 Report at 5-6), taking into account the assumptions that were made
22 and the steps that were taken to mitigate the losses, such as the use
23 of side pocket funds to hold penny stock shares pending their sale
24 (id. at 13-28).  This information is reliable and constitutes
25 suitable grounds for the Court to rely on when making its loss
26 determination.

27 The Appleby report is not made less reliable because it contains
28 language limiting Appleby's liability in civil suits that might rely

on the numbers involved.  Far from "disclaiming accuracy for its calculations," as defendant claims (Dkt. 301 at 7), the purpose of this section appears to be to preserve confidentiality of the calculations and to protect Appleby from civil liability from any use of the report.  (Appleby Report at 3-4.)  This carve-out does not negate the findings contained therein, nor does it preclude the Court from basing its loss calculations on the reasonable methodology and calculations contained in the report.

### B. The Two-Level Enhancement for Sophisticated Fraud that Occurred Overseas Is Warranted

Defendant challenges the application of a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) because he alleges that the overseas conduct was not done to evade detection or conceal the fraud.  (Dkt. 301 at 12-13.)  Defendant misreads the purpose of the enhancement and misconstrues the facts of this case.  A two-level enhancement under 2B1.1(b)(10) applies when "a substantial part of a fraudulent scheme was committed from outside the United States," or when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. 2B1.1(b)(10)(B)-(C).  Both prongs are met here.

First, a substantial part of the fraud took place overseas.  The Absolute Funds, which were headquartered in Mallorca, purchased millions of shares of penny stock companies that defendant selected.  Defendant then worked with his co-conspirators -- all based outside the United States -- to execute manipulative penny stock trades and to conceal the fraud scheme.  Ficeto (from Beverly Hills) directed his stock trader to use a secret instant messaging system to

4

coordinate manipulative trades with co-conspirator Colin Heatherington, who, along with Florian Homm and Craig Heatherington, was based in Mallorca.  At trial, the evidence established that defendant was in frequent, if not daily, contact with his Mallorca-based co-conspirators.  Defendant also designed and managed complex financing transactions to take small, U.S.-based companies public, so that he and his co-conspirators could trade and manipulate the companies' stock using money from foreign hedge funds.  Defendant employed various international money transfers to launder the illicit proceeds that he and his co-conspirators generated from the scheme, which was then, in turn, transferred to various foreign banks.

The two-level enhancement also applies because the fraud involved sophisticated means; that is, "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1(b)(10)(C).  The fraud scheme here was sophisticated both in its inception: the PIPE transactions orchestrated by defendant to facilitate the Absolute Funds' investments in the penny stocks and to obtain shares in the penny stocks for himself and his co-conspirators; and in its execution: sophisticated sequences of match trades, wash trades, and cancelled trades approved by defendant through a secret IM system at Hunter World Markets to artificially inflate the share price of the penny stocks.  Defendant's own conduct was also sufficiently sophisticated because he used his robust knowledge of the securities industry to exploit weaknesses and conceal his fraud.  Defendant, for example, implemented a sham compliance program at Hunter World Markets by, among other things, instructing his head trader to use a secret IM system and to conceal information from the company's part-

time compliance officer. This enabled the operation to have a veneer of legitimacy and evade detection. As discussed below, defendant also caused numerous sophisticated transfers and transactions among myriad bank accounts to conceal proceeds of the fraud.

### C. Two-Level Enhancements for Money Laundering and for Sophisticated Money Laundering Are Warranted

Defendant was convicted of money laundering conspiracy in count 30. Consequently, a two-level enhancement applies under U.S.S.G. § 2S1.1(b)(2)(B). Application Note 3(C) to that section precludes a two-level enhancement only in cases where the "sole object" of the money laundering conspiracy was to commit an offense under 18 U.S.C. § 1957. That is not the case here. Defendant was convicted of a dual object conspiracy in Count 30: namely, conspiracy to commit concealment money laundering under 1956(a)(1)(B)(i) and to engage in monetary transactions in property derived from wire or securities fraud under section 1957. Application Note 3(C) does not apply because defendant was convicted of a money laundering conspiracy to, among other things, violate section 1956.

Defendant would have the Court impermissibly parse the conviction on Count 30 into a section 1956 part, for which a two-level enhancement is proper, and a section 1957 part, for which a two-level enhancement is precluded. (Dkt. 310 at 13-14.) Although the Ninth Circuit has not addressed the issue, the Tenth Circuit has rejected similar efforts. In United States v. Adargas, the court held that Application Note 3(C) "plainly refers back to the conspiracy of which the defendant was convicted . . . under 18 U.S.C. § 1956(h)." 366 F.3d 879, 883 (10th Cir. 2004) (internal quotation marks omitted, alteration in original). The court found that the

plain language of the application note supported the government's view that the note "simply refers to the object of the conspiracy as defined by the charge to which [defendant] pled guilty," and should not require further inquiry. Id. at 882-83. The same reasoning applies here. The Court is justified in applying a two-level enhancement based on defendant's conviction by a jury on count 30, a dual-object money laundering conspiracy that includes § 1956 as an object.

Furthermore, an additional two-level enhancement applies for sophisticated money laundering. Defendant argues that offshore bank accounts, such as the Cook Islands account (the subject of defendant's false statement conviction), are "not synonymous with sophisticated laundering." (Dkt. 301 at 14-15 (internal quotation mark omitted).) As defendant acknowledges, however, the use of offshore financial accounts is expressly enumerated in the guidelines as an appropriate bases for the enhancement. See U.S.S.G. § 2S.1.1(b)(3), comment. (n.5(A)(iv)). Moreover, through the trial testimony of FBI Special Agent Tonya Pinkerton, the government introduced evidence of defendant's significant, sophisticated efforts to move money around and conceal its source. For example, Special Agent Pinkerton testified about a three-page exhibit showing the complex sequence of transactions that defendant conducted to move his illicit penny stock proceeds from Treasury bills through numerous accounts and then finally to his accounts in the Cook Islands. See Ex. 1144 (attached hereto as Exhibit 1). Such transactions are clear evidence of "complex or intricate offense conduct pertaining to the execution or concealment" of the offense conduct. U.S.S.G.

§ 2S.1.1(b)(3), comment. (n.5(A)). A two-level enhancement for sophisticated money laundering is warranted.

### D. The Three-Level Aggravating Role Enhancement Is Warranted

Defendant challenges application of a three-level enhancement for a manager or supervisor (but not an organizer or leader) of a criminal enterprise that involved five or more participants or was otherwise extensive under U.S.S.G. § 3B1.1(b). (See Dkt. 301 at 15-16.) But, as the PSR notes, the scheme here involved at least five participants: defendant, Florian Homm, Colin Heatherington, Craig Heatherington, and Tony Ahn.[1] (Rev. PSR ¶ 55.) In order to impose the enhancement, there must be a "showing that the defendant had control over other[]" participants or "organiz[ed] other[ ] [participants] for the purpose of carrying out" the charged crimes. United States v. Whitney, 673 F.3d 965, 975 (9th Cir. 2012) (internal quotation marks omitted). A defendant "organizes" other participants if he has "the necessary influence and ability to coordinate the behavior of others so as to achieve the desired criminal result[s]." United States v. Doe, 778 F.3d 814, 826 (9th Cir. 2015).

The evidence at trial showed that defendant engaged in precisely that level of organization. He recruited penny stock companies and then orchestrated the reverse merger transactions to facilitate the Absolute Funds' investments in the penny stock companies. Defendant continued bringing the penny stock companies to Homm for investment,

---

[1] A person who has received a grant of immunity is still properly counted as a "participant." See United States v. Tavares, 705 F.3d 4, 30 (1st Cir. 2013) ("In light of our sister circuit's reasoning and the clear language of the Guideline, we also hold that a 'participant' can be an immunized witness against the defendant.") (citing United States v. Anderson, 580 F.3d 639, 650, n.16 (7th Cir. 2009)).

despite warnings from Absolute Funds' employees like Darius Parsi that the penny stocks were damaging the Funds.  Defendant also managed trading at Hunter World Markets, including directing Tony Ahn to execute manipulative trades in the penny stocks.  Testimony from Elizabeth Pagliarini, as corroborated by Ahn himself, was that Tony Ahn was a "glorified order taker" and did not have the authority to approve stock trades without defendant's awareness, approval, and direction.

Defendant's claim that there is insufficient evidence in the trial record for the Court to conclude that he managed or supervised others rings hollow.  United States v. Holden, 908 F.3d 395 (9th Cir. 2018), the case defendant cites in support of his argument, is inapposite.  Holden involved a criminal conspiracy with only two "co-equal" participants.  Id. at 402.  The conspiracy here involved at least the five participants described above.  Moreover, the guidelines also provide that the enhancement applies to criminal conduct that involves less than five people if the conduct was "otherwise extensive."  U.S.S.G. § 3B1.1(b).  "A fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  Id. at comment. (n.3); see also United States v. Kent, 821 F.3d 362, 370 (2d Cir. 2016) (citing Note 3 to reject as "unavailing" the defendant's suggestion that there were fewer than four knowing participants "because they were not all working at the same time"); United States v. Rose, 20 F.3d 367, 374 (9th Cir. 1994) ("Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount of money fraudulently obtained or laundered.")

(citations omitted).  The complex fraud and money laundering scheme here involved at least five knowing participants, as well as numerous unwitting outsiders, including employees at Hunter World Market like Ms. Pagliarini and Ms. Razo; penny stock company owners like Sam Chapman; and numerous investors, like Matthew Daniel, who were duped into investing in the Absolute Funds based upon false performance figures.  The criminal conduct spanned two continents, Europe and North America (both the United States and Canada), and involved complex investment banking deals, manipulative trades in hundreds of millions of shares of penny stocks, wire transfers to bank accounts around the world, and corporate documents from the Cayman Islands, the United Kingdom, Lichtenstein, Canada, and the Cook Islands, among others.  Moreover, the scheme caused more than $200 million in losses and lined defendant's pockets with tens of millions of dollars.  Notably, the enhancement often applies where, as here, the manager or supervisor "tended to profit more."  U.S.S.G. § 3B1.1(b) comment. (backg'd).  Defendant's enormous profits dwarfed every employee at Hunter World Markets (except for co-owner Homm).

**E.   The Two-Level Enhancement for Obstruction of Justice Is Warranted**

Defendant engaged in conduct that is specifically defined by the guidelines as obstructive and thus a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 applies.  Defendant directed Tony Ahn to conceal the existence of evidence (namely, the secret IM system) that was material to the official investigations by FINRA and the SEC.  See U.S.S.G. § 3C1.1 comment (n.4(D)).  Similarly, defendant instructed Ahn that "I don't know" and "I don't remember" are "good answers" in response to the SEC's questions

related to the manipulative trading practices at Hunter World Markets.  That defendant ultimately turned over the secret IMs and divulged the Cook Islands account after lying about it under oath (Dkt. 301 at 16-17) does not undo his pattern of obstructive conduct that occurred for years.  As Lucee Kirka, the SEC investigating attorney testified, had she known about the Cook Islands account during defendant's testimony before the SEC, she would have asked questions about it.  This enhancement plainly applies.

### F. A Restitution Order of $215,815,031 is Proper and Defendant Should be Credited $14,954,265.50 for Prior Payments to the Absolute Funds

As detailed in the Appleby Report, the applicable restitution amount is $215,815,031, which reflects actual losses the victim Absolute Funds incurred as a result of defendant's fraud scheme. (See Dkt. 288 at 17-19.)  Thus, the restitution order should reflect the full actual loss amount of $215,815,031.  See 18 U.S.C. § 3664(f)(1)(A) ("in each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant"); 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.").

Courts have interpreted the statutes governing restitution to mean that, as general rule, a defendant is not entitled to an offset against a restitution order for money that was forfeited to the government.  United States v. Newman, 659 F.3d 1235, 1241-43 (9th Cir. 2011) (because forfeiture and restitution serve different purposes-one for punishment, the other to make the victim whole-the

defendant must pay both; "the district court may not reduce forfeiture because of an order of restitution to a victim or because the victim already has been made whole; see also United States v. Navarrete, 667 F.3d 886, 888 (7th Cir. 2012) (restitution and forfeiture are cumulative; that are "a form of punitive damages piled on top of the other penalties for the defendant's crime"); United States v. Pescatore, 637 F.3d 128, 137 (2nd Cir. 2011) (forfeiture and restitution are separate remedies with different purposes; defendant was not entitled to have the Government apply $2.5 million in forfeited funds to a $3 million restitution order); United States v. Alalade, 204 F.3d 536, 540-41 (4th Cir. 2000) (under the Mandatory Victims Restitution Act, the defendant is not entitled to an offset against the restitution order for the value of the fraud proceeds that the Government forfeited administratively).

However, as defendant noted (Dkt. 301 at 19-20), funds seized both from defendant and from former Absolute Funds' CEO Sean Ewing should be credited against the total restitution amount because the government did, in fact, turn that money over to the victim, Absolute Funds. See 18 U.S.C. § 3663(j)(2)(A) (providing that "any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in any Federal civil proceeding . . . ."). Thus, the Court should enter a restitution order in the amount of $215,815,031, and defendant should receive a credit against that amount based on the following payments the victim Absolute Funds received:

- $4,920,872.42 paid on 9/10/2014 related to United States v. $5,437,986.06 In Bank Funds et al., CV 13-8685

12

- $152,579.08 paid on 12/20/2016 related to <u>United States v. One Real Property Located in Malibu, California</u>, CV 13-8686
- $1,880,814 paid on 9/10/2014 related to <u>United States v. One Parcel of Raw Property Located in Park City, Utah</u>, CV 13-8684

The above payments were distributed to the Absolute Funds in the amount of $6,954,265.50 (accounting for deductions for miscellaneous fees assessed by the United States Marshals' Service which were not paid to the Absolute Funds).  In addition, the following payment from Sean Ewing should also be credited.

- $8,000,000.00 paid to the Absolute Funds on 3/13/2017 related to <u>United States v. $8,000,000.00 In Funds</u>, CV 16-6228

Therefore, the total credit that should be applied is $14,954,265.50, which equals the total amount of payments by defendant and Ewing that were distributed to the Absolute Funds.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's late-received objections to the PSR and sentence defendant to 96 months' imprisonment, based on a total offense level of 43, and restitution in the amount of $215,815,031, with an applicable credit of $14,954,265.50.